[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 14, 2006
THOMAS K. KAHN
CLERK

No. 05-13826
Non-Argument Calendar

_____

BIA No. A28-654-740

OLUWATOYIN UTOH,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(August 14, 2006)**

Before TJOFLAT, BIRCH and CARNES, Circuit Judges.

PER CURIAM:

On 16 June 2006, Oluwatoyin Utoh filed a petition for rehearing. We grant

the petition. We withdraw our previous opinion and substitute the following opinion therefor.

Oluwatoyin Utoh, a native of Nigeria, has petitioned for review of the final order of the Board of Immigration Appeals ("BIA"), which affirmed the decision of the immigration judge ("IJ"), ordering deportation and denial of voluntary departure under former § 241(a)(4) of the Immigration and Nationality Act ("INA").[1]  Specifically, Utoh challenges the IJ's denial of her application for suspension of deportation pursuant to 8 U.S.C. § 1254 (repealed 1996).[2]  Because Utoh raises a question of law – whether, under the facts of this case, she was statutorily ineligible for suspension of deportation based on a lack of good moral character – we have jurisdiction over her petition for review.  Because she could not establish good moral character during the statutory ten-year period, we DENY her petition.

---

[1]This section, 8 U.S.C. § 1251(a)(4) (1988), later became 8 U.S.C. § 1251(a)(2) (1994). In 1996 it was transferred to 8 U.S.C. § 1227.

[2]Section 308(b)(7) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ("IIRIRA"), repealed § 1254.

# I. BACKGROUND

According to the record of administrative proceedings before the INS,[3] Utoh claims that she entered the United States with a non-immigrant visa in 1978. Administrative Record ("AR") at 105. On 5 October 1988 she was convicted of one count of forgery (2nd degree) and three counts of financial transaction card theft, in violation of §§ 16-9-2, and 16-9-31 of the Official Code of Georgia. Id. at 257, 262-63. Just a few months later, in January 1989, the INS issued an order to show cause ("OSC") charging Utoh with deportability, pursuant to INA § 241(a)(4), on the ground that she had thus been convicted of two or more crimes involving moral turpitude ("CIMT") not arising out of a single scheme of criminal misconduct.

In March 1990, the deportation proceedings against Utoh were administratively closed so that she could pursue amnesty. Id. at 258. In denying a request for reduction in the amount of her bond, however, the BIA noted that, "[Utoh] has four convictions for crimes of moral turpitude, and an arrest warrant for passport fraud. All of these crimes reflect adversely upon her character and

---

[3] On 25 November 2002, President Bush signed into law the Homeland Security Act of 2002 ("HSA"), Pub. L. No. 107-296, 116 Stat. 2135. The HSA created a new Department of Homeland Security ("DHS"), abolished the INS, and transferred its functions to the new department. Because this case was initiated while the INS was still in existence, this opinion refers to the agency as the INS rather than the DHS.

indicate her disrespect for the laws of the United States." Id. at 229. Her amnesty application was denied and her appeal dismissed in April 1994.

In August 1998, over eight years after the initial OSC, Utoh received a notice to appear ("NTA") to show why she should not be removed from the United States.[4] Id. at 317-19. In November 1998, the INS filed additional charges of deportability on the grounds that, on 5 May 1989, Utoh had been convicted of filing a false passport application, in violation of 18 U.S.C. § 1542. Id. at 254, 230-47. The indictment alleged that Utoh had committed the offense on 11 December 1987. Id. at 233.

At a deportation hearing held on 9 January 1999, Utoh conceded deportability as charged in the OSC, based on her admission that the state convictions were for CIMTs. Id. at 132; see also id. at 276-77. In her brief in support of eligibility for relief, Utoh admitted that she had been convicted, in May 1989, for filing a false passport application in 1987. Id. at 278. She argued that, despite her May 1989 CIMT conviction, she had not actually committed any offenses during the ten years following the 1988 CIMT convictions that had

_____

[4] After passage of the IIRIRA, deportable and inadmissible aliens are subject to a single form of removal proceedings under 8 U.S.C. § 1229a. The IIRIRA re-termed deportation and exclusion "removal," and called the written notice initiating proceedings (formerly an OSC) a Notice to Appear ("NTA"). See IIRIRA § 308(b)(6) (striking 8 U.S.C. § 1252b(a)(1)); IIRIRA § 304(a)(3) (adding 8 U.S.C. §§ 1229, 1229a)). Due to complications related to these changes, the 1998 NTA in this case was eventually withdrawn and the case proceeded pursuant to the January 1989 OSC for deportability.

rendered her deportable, thereby establishing good moral character and making her eligible for suspension of deportation under 8 U.S.C. § 1254. Utoh also moved to designate France as her country for deportation.

At a continuation of the hearing, after reciting the relevant statutory requirements for suspension of deportation the IJ ruled:

> [Utoh] has less than 10 years of good moral character based upon the conviction for passport fraud that occurred 5/5/89. Passport fraud has been held to be a crime involving moral turpitude. See Matter of Correa Garis, 20 I&N Dec. 451, 454, BIA 1992. The Court finds that the record as indicated shows the respondent is not statutorily eligible for suspension of deportation based upon her conviction for passport fraud. See Exhibit 4. Further convictions also that have been admitted and deportability conceded and on that see generally Exhibit 2. The Court therefore finds respondent is not eligible for the relief of suspension of deportation.

Id. at 65. He also rejected Utoh's request for voluntary departure, found her deportable, and ordered her deported to France, and if not accepted there, to Nigeria. Id. at 65-66. Utoh appealed. Before the BIA, the INS argued that Utoh was statutorily ineligible for suspension of deportation because she had conceded deportability and fewer than ten years had elapsed between her 1988 CIMT convictions and the filing of the additional charges of deportability in 1998. Id. at 29. The INS made this argument based upon the BIA's ruling in In re Lozada, 19 I. & N. Dec. 637 (BIA 1988) – that the ten year period required for suspension of deportation is measured from the date of conviction rather than from the date of

5

commission of the offense rendering the alien deportable – and the "stop time" rule established by 8 U.S.C. § 1229b(d)(1).[5] The BIA "affirm[ed], without opinion, the results of the [IJ's] decision below," pursuant to 8 C.F.R. § 3.1(a)(7) (2002). Id. at 7.

This appeal arises out of Utoh's 2003 petition for habeas relief, pursuant to 28 U.S.C. § 2241.[6] In that petition, Utoh argued that (1) the BIA rule announced in Lozada is inapplicable to her case; and (2) neither Congress nor the BIA, in interpreting 8 U.S.C. § 1229b(d)(1) in In re Nolasco-Tofino, 22 I. & N. Dec. 632, 641 (BIA 1999),[7] intended for the "stop time" rule established thereby to apply to a case such as hers, where "eligibility depends upon the accumulation of a certain period of residence after an otherwise disqualifying event." Habeas Petition at 11.

In April 2005, a magistrate judge entered a final report and recommendation that relief be denied. The magistrate judge found that "because [Utoh] was

_____

[5]Under the "stop-time" rule, service of an NTA or OSC for removal proceedings "stops time" or ends an alien's period of residence or continuous physical presence in the United States, for purposes of an application for suspension of deportation. See Tefel v. Reno, 180 F.3d 1286, 1288-90 (11th Cir. 1999) (explaining the history and application of the "stop-time" rule).

[6]We dismissed as untimely Utoh's original petition for review because she filed it thirty-one days after the BIA's decision. See Utoh v. United States Att'y Gen., No. 02-16006 (11th Cir. 2002) (order dismissing petition). We denied her petition for reconsideration. Id. (order denying petition for reconsideration).

[7]In In re Nolasco-Tofino, the BIA clarified that "the stop-time rule of section 240A of the Act applies to suspension of deportation applications generally and that only those applications that fall within the ambit of sections 309(c)(5)(B) and (C) of IIRIRA, as amended, are exempt." 22 I. & N. Dec. at 641.

6

convicted of passport fraud during the at least 10-year 'continuous period' beginning in October 1988, the IJ correctly concluded that [Utoh] could not prove that she was 'a person of good moral character' during that period. Report & Recommendation at 6-7. The report and recommendation also stated that Utoh's "stop-time" rule argument was irrelevant because the IJ had not relied upon the rule in denying her application for suspension of deportation. Id. at 6. Utoh filed objections in which she argued that common sense dictated that good moral character should depend on her behavior during the statutory period, rather than on any prior behavior later resulting in a conviction. Petitioner's Objections at 3. Utoh did not object to the magistrate judge's determination that the "stop-time" rule issue was irrelevant. Because Congress had, in the meantime, enacted the REAL ID Act, § 106(c) of which directed that all habeas petitions be treated as petitions for review and ruled on by federal appellate courts, the district court pretermitted review of Utoh's petition and transferred the matter to us.[8]

## II. DISCUSSION

A. Jurisdiction

We are "obligated to inquire into subject-matter jurisdiction sua sponte whenever it may be lacking." Chacon-Botero v. U.S. Att'y Gen., 427 F.3d 954,

_____

[8]Prior to the transfer, the district court granted a motion for stay of deportation through its final decision on the habeas petition.

956 (11th Cir. 2005) (per curiam). "We review questions of subject matter jurisdiction <u>de</u> <u>novo</u>." <u>Brooks v. Ashcroft</u>, 283 F.3d 1268, 1272 (11th Cir. 2002). The REAL ID Act amended the judicial review provisions of 8 U.S.C. § 1252 to provide that "[n]otwithstanding any other provision of law . . . including section 2241 of Title 28 . . . a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal." 8 U.S.C. § 1252(a)(5). The REAL ID Act provides that

> [i]f an alien's case, brought under section 2241 of title 28, United States Code, and challenging a final administrative order of removal, deportation, or exclusion, is pending in a district court on the date of the enactment of this division, then the district court shall transfer the case (or the part of the case that challenges the order of removal, deportation, or exclusion) to the court of appeals for the circuit in which a petition for review could have been properly filed under section 242(b)(2) of the Immigration and Nationality Act.

REAL ID Act of 2005, Pub. L. No. 109-13, § 106(c), 119 Stat. 311 (2005). The provision then specifies that "[t]he court of appeals shall treat the transferred case as if it had been filed pursuant to a petition for review under such section 242, except that subsection (b)(1) of such section [requiring that petitions for review be filed within 30 days of the final removal order] shall not apply." <u>Id.</u>; <u>see</u> <u>also</u> <u>Balogun v. United States Att'y Gen.</u>, 425 F.3d 1356, 1360 (11th Cir. 2005) (explaining that habeas review became unnecessary with the passage of § 106(a)(1)(A)(iii) of the REAL ID Act).

8

Although, pursuant to 8 U.S.C. §1252(a)(2)(B)-(C), we do not have jurisdiction to review discretionary decisions made by the Attorney General or the Secretary of the Department of Homeland Security, or a final order of removal against an alien who is removable for having committed a criminal offense pursuant to 8 U.S.C. §§ 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D), nothing in § 1252 precludes us from reviewing constitutional claims or questions of law raised upon a petition for review which is properly filed.  8 U.S.C. § 1252(a)(2)(D); see also Balogun, 425 F.3d at 1359 (holding that the REAL ID Act gave us jurisdiction to review a criminal alien's petition for review of an order of removal raising a question of law).

Utoh's 28 U.S.C. § 2241 petition challenging her deportation order was pending on the date that the REAL ID Act was enacted, and thus, was properly transferred to us.  See 8 U.S.C. § 1252(a)(5); REAL ID Act § 106(c).  Although her deportation was based upon a CIMT, we have jurisdiction to review her petition to the extent that it raises questions of law or constitutional claims.  See 8 U.S.C. § 1252(a)(2)(D).  Whether, under the undisputed facts of her case, Utoh can establish good moral character for purposes of statutory eligibility for suspension of deportation is a question of law.  Accordingly, we have jurisdiction to review her petition.  See Balogun, 425 F.3d  at 1360.

9

B. Good Moral Character

We review the legal determinations of an agency such as the BIA de novo. Nreka v. U.S. Att'y Gen., 408 F.3d 1361, 1368 (11th Cir. 2005). In so doing, we accord substantial deference to that agency's interpretation of the statutes and regulations that it administers. See United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S. Ct. 2164, 2171 (2001) (Chevron[9] deference due when an agency acts according to legally delegated authority inherent in formal adjudication); INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S. Ct. 1439, 1445 (1999) ("BIA should be accorded Chevron deference as it gives ambiguous statutory terms 'concrete meaning through a process of case-by-case adjudication.'").

Because our jurisdiction is limited to review of final agency decisions, we generally review only the decision of the BIA. Chacon-Botero, 427 F.3d at 956. In this case, the BIA "affirm[ed], without opinion, the results of the [IJ's] decision below," and thus did not expressly adopt the IJ's reasoning. AR at 7. However, the federal regulation cited by the BIA as the authority for its decision provides that "[a]n order affirming without opinion, issued under authority of this provision . . . does not necessarily imply approval of all of the reasoning of that decision, but does signify the Board's conclusion that any errors in the decision of the

---

[9]Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S. Ct. 2778, 2781-82 (1984).

10

Immigration Judge or the Service were harmless or nonmaterial." 8 C.F.R.

3.1(a)(7)(B)(iii) (2002). It also provides that the IJ's decision thus becomes "the

final agency determination." Id.

At the time Utoh's deportation proceedings were initiated, the Attorney

General could order suspension of deportation only when an alien

> [was] deportable under paragraph (2), (3), or (4) of section 1251(a) of this title; ha[d] been physically present in the United States for a continuous period of not less than ten years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and prove[d] that during all of such period [s]he ha[d] been and [was still] a person of good moral character; and [was] a person whose deportation would in the opinion of the Attorney General, result in exceptional and extremely unusual hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1254(a)(2) (1994) (repealed 1996). Accordingly, the time period during

which good moral character had to be established under this provision began with a

qualifying conviction, had to run for at least ten years, and in addition to this, the

applicant had to show current good moral character at the time of the final

determination. Id. Even when an alien established all the requisite factors, the

decision of whether to grant suspension of deportation remained within the

discretion of the Attorney General. Gomez-Gomez v. INS, 681 F.2d 1347, 1349

(11th Cir. 1982). The applicant for suspension bore the burden of demonstrating

11

both statutory eligibility and that the equities merited a favorable exercise of discretion. 8 C.F.R. § 240.64(a) (2001).

Federal law provides that any alien who, at any time after admission, is convicted of two or more CIMTs, not arising out of a single scheme of criminal misconduct, is deportable. 8 U.S.C. § 1227(a)(2)(A)(ii).[10] The BIA has clarified that the ten-year period, when deportability involves CIMTs, begins with the conviction rather than the commission of the CIMTs. In re Lozada, 19 I. & N. Dec. 637, 640 (BIA 1988). Further, according to the interpretation of § 1254(a)(2) followed by the INS and the majority of courts to address the issue, the ten-year period begins on the date of the most recent act constituting grounds for deportation. See In re Wong, 13 I. & N. Dec. 427, 429-30 (1969) (also describing development of law on this issue in Second, Third, Sixth, Eighth, and Ninth Circuits). Finally, the BIA has confirmed that an alien's "conviction for making false statements, in order to fraudulently obtain a passport in another person's name, is [a conviction] for a crime involving moral turpitude." In re Correa-Garces, 20 I. & N. Dec. 451, 454 (BIA 1992).

Here, we conclude from the first sentence of the IJ's ruling, which focuses both on the 10-year period and on the passport fraud conviction rather than on its commission, that the IJ based his decision on the facts that, under the rule of

---

[10]Formerly, INA § 241(a)(4); 8 U.S.C. § 1251(a)(4) (1988).

Lozada and Wong, the May 1989 passport fraud conviction set the beginning of the ten-year period for the purposes of establishing good moral character, and as of the time of the hearing before the IJ in January 1999, ten years had not yet passed. The IJ's decision is supported by law. First, it is undisputed that Utoh was first rendered deportable by the 1988 CIMT convictions. See 8 U.S.C. § 1227(a)(2)(A)(ii). Second, it is undisputed that Utoh was convicted of making a false statement on a passport application in May 1989, and that this conviction was also properly considered a CIMT. See Correa-Garces, 20 I. & N. Dec. at 454. Utoh's 1989 passport conviction in addition to one or more of the 1988 convictions also rendered her deportable, and the INS pointed this out by filing its additional charges of deportability against Utoh in 1998. Of all the convictions forming the basis for her deportability, the May 1989 passport conviction was the most recent. Thus, after the filing of the additional charges of deportability, under the rule in Lozada and Wong, the ten-year period would run from May 1989 through May 1999. As a result, Utoh could not have been regarded as a person of good moral character because her January 1999 hearing occurred before ten years had passed after her May 1989 CIMT conviction.

Utoh argues that we should apply the new rule announced by the BIA In re Ortega-Cabrera, 23 I & N Dec. 793 (BIA 2005), with respect to moral character establishment for the purposes of cancellation of removal under 8 U.S.C. § 1229b.

13

In that case, the BIA determined that the words "such period" in 8 U.S.C. 1229b(b)(1)(B) could not mean that the period for good moral character and for physical presence were coextensive. Ortega-Cabrera, 23 I. & N. Dec. at 796-97. It so concluded, in part, because 8 U.S.C. § 1101(f)(6) makes ineligible for good moral character any alien "who has given false testimony for the purpose of obtaining any benefits under this Act," during the period for which good moral character is required. Id. The BIA reasoned that making that period coterminous with the physical presence period – at the date of the application for cancellation of removal – would absurdly not automatically disqualify an alien falsely testifying at his subsequent removal hearing. Id. at 796. Accordingly, the BIA decided that, for purposes of 1229b, the period during which good moral character must be established extends beyond filing of an application for relief to the entry of a final administrative decision. See id. at 797.

Even setting aside all issues of administrative or judicial economy, we see enough significant differences between § 1229b and former 8 U.S.C. § 1254 to conclude that application of that rule to this statute, despite their similarity of purpose, would be inappropriate: First, the text of § 1229b counts the ten-year period back from the date of application, while former § 1254 counts it forward from the time deportable status is acquired. § 1229b(b)(1)(A) ("not less than 10 years immediately preceding"); § 1254(a)(2) ("not less than ten years immediately

14

following"). Second, former § 1254 requires continued good moral character at the time of the administrative decision in addition to good moral character during the ten-year period following assumption of deportable status, so the intrastatutory problem observed in Ortega-Cabrera as to § 1229b does not hold. § 1254(a)(2) ("during all of such period he has been and is a person of good moral character"); §1229b(1)(B) ("has been a person of good moral character during such period"); Ortega-Cabrera, 23 I. & N. Dec. at 796-97. Further, § 1229b includes a new separate factor which makes any applicant who has ever been convicted of a CIMT ineligible for cancellation of removal. § 1229b(1)(C). Accordingly, we conclude that the rule extending the period for determination of good moral character for purposes of cases brought pursuant to 8 U.S.C. § 1229b does not apply to cases brought pursuant to 8 U.S.C. § 1254(a)(2). Thus, as a matter of law, Utoh was ineligible for suspension of deportation.

### III. CONCLUSION

Utoh has petitioned for review of the final order of the BIA, which affirmed without opinion the decision of the IJ ordering deportation and denial of voluntary departure under the former INA. Because, as a matter of law, Utoh could not establish good moral character, she could not satisfy the initial elements required for eligibility of suspension of deportation. Accordingly, we **DENY** her petition.

15