# In re Samuel FUENTES-CAMPOS, Applicant

*Decided May 14, 1997*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

An applicant for admission in exclusion proceedings who is inadmissible on the basis of a controlled substance offense is statutorily eligible for a waiver of inadmissibility under section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1994), *as amended by* Antiterrorism and Effective Death Penalty Act of 1996, § 440(d), Pub. L. No. 104-132, 110 Stat. 1214, 1277.

FOR APPLICANT: James Todd Bennett, Esquire

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: John W. Seaman, Jr., Assistant District Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, ROSENBERG, MATHON, and GUENDELSBERGER, Board Members.

SCHMIDT, Chairman:

The issue in this case is whether an applicant for admission who is excludable on the basis of a controlled substance offense is eligible for a waiver of inadmissibility under section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (1994), as amended by section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, 1277 (enacted Apr. 24, 1996) ("AEDPA"). The Immigration Judge determined that the applicant was statutorily ineligible for relief under section 212(c) of the Act. The applicant has appealed from that decision. The appeal will be sustained, and the record will be remanded for further proceedings.

## I. SUMMARY OF FACTS

The applicant is a native and citizen of Mexico who became a lawful permanent resident of the United States on February 2, 1988. On March 25, 1995, he was detained by the Immigration and Naturalization Service as he attempted to enter the United States at Nogales, Arizona. Thereafter, on or about November 6, 1995, he pled guilty to possession of marijuana with

intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) (1994).

The Service subsequently initiated exclusion proceedings. At a hearing on July 5, 1996, the applicant acknowledged being excludable as a controlled substance trafficker and an alien convicted of a controlled substance violation. He also sought to apply for a section 212(c) waiver. However, in a written decision dated August 5, 1996, the Immigration Judge granted the Service's motion to pretermit the section 212(c) application.

## II. ISSUE ON APPEAL

Is an applicant for admission in exclusion proceedings, who is inadmissible on the basis of a controlled substance offense, statutorily ineligible for relief under section 212(c) of the Act as "an alien who is deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i)"?

## III. THE AEDPA AMENDMENT TO SECTION 212(c)

Prior to the enactment of section 440(d) of the AEDPA, section 212(c) of the Act read as follows:

> Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) (other than paragraphs (3) and (9)(C)). Nothing contained in this subsection shall limit the authority of the Attorney General to exercise the discretion vested in him under section 211(b). The first sentence of this subsection shall not apply to *an alien who has been convicted* of one or more aggravated felonies and has served for such felony or felonies a term of imprisonment of at least 5 years. (Emphasis added).

The AEDPA was signed on April 24, 1996, more than 2 months prior to the applicant's exclusion hearing. Congress subsequently made a technical correction to section 440(d) of the AEDPA in section 306(d) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-612 (enacted Sept. 30, 1996) ("IIRIRA"). As corrected, section 440(d) of the AEDPA changed the last sentence of section 212(c) of the Act to provide as follows:

> This subsection shall not apply to *an alien who is deportable* by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i). (Emphasis added.)

## IV. SECTION 212(c) ELIGIBILITY

### A. Principles of Statutory Construction

The object of statutory construction is to determine the congressional intent with respect to the legislation enacted. *Matter of W-F-*, 21 I&N Dec. 503 (BIA 1996). Where the language of the statute is clear, the inquiry is ended. The unambiguously expressed intent of Congress must be given effect. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

The paramount index of congressional intent is the plain meaning of the words used in the statute taken as a whole. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *Matter of Grinberg*, 20 I&N Dec. 911, 912 (BIA 1994). Presumably, the legislative purpose is expressed by the ordinary meaning of the words used. *INS v. Phinpathya*, 464 U.S. 183, 189 (1984); *Matter of W-F-, supra*; *Matter of Barrett*, 20 I&N Dec. 171, 174 (1990). In ascertaining the plain meaning of a provision, we construe the language in harmony with the wording and design of the statute as a whole. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *Matter of W-F-, supra*.

We find that the plain language of the amendment to section 212(c), as construed within the context of the well-established statutory distinctions between deportation and exclusion, provides that the bar to eligibility for relief applies only to specified criminal aliens who are in deportation proceedings.

### B. "Who is deportable" Language of Section 440(d)

### 1. Distinctions Between Exclusion and Deportation

At the time the AEDPA was enacted, the distinctions between exclusion and deportation had long been recognized in immigration law. *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). The meaning of each term is well defined, and the significant differences between them are clear. *See Landon v. Plasencia,* 459 U.S. 21, 25-26 (1982) (noting the differences in the purposes and procedures in exclusion and deportation proceedings). For example, the admissibility of aliens seeking to enter the United States is determined in an exclusion hearing, while aliens already physically in this country are subject to deportation proceedings. *Id*. The grounds of inadmissibility and deportability are set forth in separate statutory provisions. *Leng May Ma v. Barber, supra.* In addition, the rights available to persons in exclusion proceedings are significantly different from those provided in deportation proceedings. *Landon v. Plasencia, supra*. Congress, which had created these important distinctions between exclusion and deportation proceedings, was obviously aware of them when it enacted the AEDPA.

Prior to its amendment, section 212(c) of the Act barred from eligibility those aliens who "had been convicted" of certain offenses. This inclusive

language covered both aliens in exclusion proceedings and those in deportation proceedings. By enacting section 440(d) of the AEDPA, Congress omitted the inclusive language of section 212(c), which made a waiver unavailable to certain criminal aliens regardless of whether they were in exclusion or deportation proceedings. Congress replaced that language with a more limited provision making relief unavailable to any alien "*who is deportable* by reason of having committed any criminal offense covered in [specified grounds of deportability]." (Emphasis added.)

Clearly, aliens in exclusion proceedings seeking admission to the United States are not "deportable." The Supreme Court has recognized the long-standing principle of the immigration laws that aliens seeking admission are subject to exclusion proceedings and are to be distinguished from "deportable" aliens, who are only subject to deportation proceedings. *See, e.g., Landon v. Plasencia, supra; Leng May Ma v. Barber, supra*. As the United States Court of Appeals for the Ninth Circuit stated, the term "deportable" is a "word of art [that] does not cover excludable aliens." *Yuen Sang Low v. Attorney General of United States*, 479 F.2d 820, 823 (9th Cir.), *cert. denied*, 414 U.S. 1039 (1973).

The phrase "is deportable" also has a long administrative history of being understood to apply only in deportation proceedings. *See Matter of Ching*, 12 I&N Dec. 710, 712 (BIA 1968) (discussing the phrase "is deportable" in relation to eligibility for suspension of deportation); *Matter of T-*, 5 I&N Dec. 459 (BIA 1953) (relating to eligibility for voluntary departure); *see also Matter of Melo*, 21 I&N Dec. 883, 885 n.2 (BIA 1997) (regarding the phrase "is deportable" in the bond context).

The Immigration Judge concluded that Congress' use of the words "who is deportable by reason of having committed any criminal offense covered in [certain sections]" indicates its intent to include within the bar to eligibility any alien who has committed a described criminal offense. However, such a conclusion is unwarranted in light of the explicit statutory reference to an alien "who is deportable." In this regard, it would have been possible for Congress to have clearly barred aliens in exclusion proceedings from relief under section 212(c) either by (1) referencing excludability and deportability, as was done in other AEDPA amendments; or (2) by applying the bar to an alien "who has been convicted of [a designated offense]," as was done in the language of section 212(c) *that was replaced*. Section 440(d) of the AEDPA makes no reference to findings of excludability or inadmissibility, despite the fact that the section 212(c) waiver was enacted to address the problem of inadmissible aliens.

We find it significant that while section 440(d) of the AEDPA makes no mention of excludable or inadmissible aliens, another section of the same statute is explicit in its inclusion of them. Section 421(a) of the AEDPA, 110 Stat. at 1270, denies asylum to an alien "if the Attorney General determines that the alien is *excludable* under subclause (I), (II), or (III) of section

212(a)(3)(B)(i) or *deportable* under section 241(a)(4)(B)." (Emphasis added.) In enacting the AEDPA, Congress obviously knew how to make specific references to excludable or inadmissible aliens when it sought to preclude them from relief. We conclude that the clause "who is deportable" in section 440(d) of the AEDPA refers only to aliens in deportation proceedings.

## 2. "Deportation" of Excludable Aliens

The Service also argues that the clause "who is deportable" was simply intended to denote someone subject to removal from the country. According to the Service, excluded aliens are actually "deported" when they are removed from the United States. In support of this contention, the Service cites the new section 237 of the Act (to be codified at 8 U.S.C. § 1227), entitled "Immediate Deportation of Aliens Excluded from Admission or Entering in Violation of Law," and 8 C.F.R Part 237, entitled "Deportation of Excluded Alien," as well as circuit court and Board case law.

We find that argument unpersuasive. Section 440(d) rewrote the bar to section 212(c) relief to apply to:

> any alien who is deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i).

The Service impliedly argues that when Congress used the term "deportable," it actually meant "deportable, or excludable and therefore deportable." Additionally, under the logic of the Service's argument, when Congress said in section 440(d) "deportable by reason of having committed any criminal offense covered in [the cited provisions of section 241(a)(2)]," it must have meant:

> any alien *who is excludable and/or* deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii), (B), (C), or (D), or any offense covered by section 241(a)(2)(A)(ii) for which both predicate offenses are, without regard to the date of their commission, otherwise covered by section 241(a)(2)(A)(i).

The Service is asking the Board to read into section 440(d) language that was not included, i.e., to add the words "excludable and/or" to the amendment. The language of the amendment is clear and unambiguous on its face—it precludes relief for designated aliens in deportation proceedings.

Finally, we find no support in the cases on which the Service relies for its assertion that the word "deportable" is not a term of art, limited to use in deportation proceedings, but includes excludable aliens as well. In these cases, as the Service itself indicates, the courts and the Board consistently combined the words "excluded and deported," never using the term "deported" alone to refer to excluded aliens. In any case, this use of the deportation terminology has been refuted by the courts. *See Leng May Ma v.*

*Barber, supra,* at 187; *Yuen Sang Low v. Attorney General of United States, supra*, at 823.

### 3. Legislative History

Because the words of section 440(d) of the AEDPA are clear, we are precluded from referring to the statute's legislative history to support a contrary construction of the law. *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992). However, we note that the legislative history does not yield any clear evidence of congressional intent regarding the amendment to section 212(c).

Section 440(d) of the AEDPA was part of a more comprehensive package of amendments aimed at enhancing "the ability of the United States to deport criminal aliens." *See* H.R. Conf. Rep. No. 518, 104th Cong., 2d Sess. (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925. For example, section 440(c) requires the Attorney General to take them into custody immediately upon completion of their criminal sentences and to deport them as expeditiously as possible; section 440(d) makes them ineligible for section 212(c) waivers; and section 440(a) eliminates judicial review of their final orders of deportation. Taken together, these amendments established an interrelated statutory structure designed to expedite removal of certain targeted categories of criminal aliens.

However, there is nothing in the legislative history of the AEDPA discussing whether any of these provisions should apply to aliens in exclusion proceedings as well as to those in deportation proceedings. The provisions were not the subject of a committee report in either house of Congress, nor were they the subject of extensive debate on the floor of the Senate or the House of Representatives. In the Senate, Senator Abraham spoke of the need to remove criminal aliens, but did not specifically address the issue of excludable aliens. *See* 141 Cong. Rec. S7822-23 (daily ed. June 7, 1995). Senator Kennedy criticized the provision. He added, "The provision in the pending bill would do nothing to enhance our ability to exclude suspected terrorists. It would impede current efforts to remove dangerous criminal aliens." *See* 141 Cong. Rec. S7851-52 (daily ed. June 7, 1995).

We cannot find this debate determinative of the question whether section 440(d) of the AEDPA extends to aliens in exclusion proceedings. Similarly, we note that this issue was not discussed in the conference committee report on the AEDPA. *See* H.R. Conf. Rep. No. 518, 104th Cong., 2d Sess. (1996). Accordingly, in regard to the specific question before us, the legislative history of the AEDPA provides little guidance.

The congressional concern over criminal aliens is, nevertheless, quite apparent in the legislative history of AEDPA. In this respect, it may well be that the failure to bar relief for *excludable* criminal aliens is simply a legislative oversight. We, however, lack the authority to rewrite the otherwise plain language of the statute simply because Congress may have been incomplete in achieving its goal.

## C. Does the clear language of section 440(d) produce an absurd or unconstitutional result?

The Service advances a second argument for holding section 440(d) of the AEDPA to apply in exclusion proceedings or deportation proceedings. This argument is not about the "plain meaning" of the amendment, but rather about the effect of applying this plain meaning in cases such as the one before us. To permit the applicant to apply for a section 212(c) waiver, the Service contends, would reduce the amendment to a legislative absurdity, one that violates the constitutional mandate of equal protection. We disagree.

### 1. Absurdity

The Immigration Judge noted that it would be absurd to interpret section 440(d) of the AEDPA as barring deportable aliens from applying for a section 212(c) waiver, but to allow excludable aliens in virtually identical circumstances to be eligible for that relief. Implicitly invoking what is known as the "absurdity principle," the Immigration Judge elected to choose another construction of the amendment, one that fits with what Congress "must have" intended when it enacted the provision.

The Supreme Court has recognized and applied the absurdity principle when confronted with a situation where the literal meaning of the statute produces a result that appears totally illogical or unreasonable. In so doing, the Court goes past the plain language of the statute to find a construction that seems to comport with congressional intent. *See, e.g., Green v. Bock Laundry Machine Co.*, 490 U.S. 504, 510 (1989) (stating, "No matter how plain the text [of the evidentiary rule] may be, we cannot accept an interpretation that would deny a civil plaintiff the same right to impeach an adversary's testimony that it grants to a civil defendant," and therefore construing the evidentiary rule in question to apply only in criminal cases).

Some applications of the absurdity principle appear to provoke little controversy. In *United States v. Kirby*, 74 U.S. (7 Wall.) 482 (1869), for example, the Court was faced with a Federal statute that prohibited any interference with the Postal Service. Despite the lack of any exceptions in the statute, the Court held that it did not apply to a State official who arrested a Federal postal carrier wanted for murder.

Other, more recent applications of this principle, however, have been challenged by members of the Court. For example, in *Public Citizen v. United States Department of Justice*, 491 U.S. 440 (1989), the Court concluded that regardless of the terms of the statute, Congress did not intend the Federal Advisory Committee Act to apply to the Department's use of the American Bar Association to evaluate judicial candidates. Concurring in the result but dissenting from the Court's reliance on the absurdity principle, Justice Kennedy asserted that even if a particular application of the clear terms of a statute might be unconstitutional, that fact, in and of itself, does not

render a straightforward application of the language absurd, thereby allowing the Court to conclude that the statute does not apply. *Id.* at 472.

Whatever the scope of the absurdity principle, we conclude that it cannot be found dispositive of the case before us. In enacting section 440 of the AEDPA, Congress intended to create a series of provisions that would promote the swift removal of designated categories of criminal aliens from the United States. However, leaving a narrow category of such aliens an opportunity to apply for relief could only be said to achieve an incomplete result, not an absurd one.

Identifying a shortcoming in section 440(d)—some but not all of the criminal alien population will be denied the opportunity to apply for a section 212(c) waiver—is significantly different from concluding that the provision is so illogical that Congress "must have" intended something else. We are therefore not at liberty to rewrite the statute on the basis that it leads to an absurd result. *See Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 126 (1989) ("Our task is to apply the text, not to improve upon it."). In any event, we would not find it absurd to require an alien who has committed a serious criminal offense to leave the United States as a condition of seeking relief under section 212(c) from outside the border.

## 2. Unconstitutionality

Both the Service and the Immigration Judge found that the inquiry did not stop with the clarity of the language in section 440(d). Rather, they concluded that if the amendment meant what it seemed to say—aliens in exclusion proceedings could apply for a section 212(c) waiver, but similarly situated aliens in deportation proceedings could not—the result would violate the constitutional principle of equal protection. Therefore, they construed the statute to avoid this perceived infirmity. Under their construction of the AEDPA, if one group of aliens was to be denied relief, so would the other.

We recognize the canon of statutory interpretation stating that constructions of doubtful constitutional validity should be avoided where possible. *See United States v. Witkovich*, 353 U.S. 194, 199 (1957); *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 407 (1909). However, inasmuch as we find no ambiguity in section 440(d), we find it unnecessary to resort to this canon.

Faced with an unambiguous statutory mandate, our task is simple: we must apply the statute as written to the cases that come before us. It is well settled that we lack jurisdiction to rule on the constitutionality of the Act and the regulations we administer. *Matter of C-*, 20 I&N Dec. 529 (BIA 1992). Therefore, even if we were to perceive a constitutional infirmity in the unambiguous statute before us, we would be without authority to remedy it. *See, e.g., Matter of Lazarte,* 21 I&N Dec. 214 (BIA 1996) (Schmidt, Chairman, concurring) (stating that the Board cannot engage in equal protection analysis where the statute is clear and there consequently is nothing to "interpret").

We also find that this situation is significantly different from that which prompted the Second Circuit's equal protection decision in *Francis v. INS,* 532 F.2d 268 (2d Cir. 1976). In *Francis*, the court noted that the text of section 212(c) limited availability of the waiver to aliens who had left the United States and were seeking reentry (in other words, aliens in exclusion proceedings). Nevertheless, this Board had permitted some aliens in deportation proceedings to apply—aliens who were also applying for adjustment of status as a relief from deportation, and aliens who had departed and returned to the United States after committing the act that rendered them deportable. Our decisions, however, did not permit aliens in deportation proceedings to apply if they had not left and returned after committing the deportable act. *See Matter of Arias-Uribe*, 13 I&N Dec. 696 (BIA 1971).

In *Francis*, the Second Circuit stated that it recognized Congress' power to create different standards of admission and deportation for different groups of aliens. However, it concluded that the Board violated the constitutional requirement of equal protection when it permitted one alien *in deportation proceedings* to apply for a waiver but denied permission to another alien *in deportation proceedings*, based solely on the fact that one had departed and returned prior to the deportation proceedings while the other had not. In *Matter of Silva*, 16 I&N Dec. 26 (BIA 1976), following the Service's decision to apply the *Francis* decision nationwide, this Board also found it appropriate to permit otherwise eligible aliens in deportation proceedings to apply for the waiver, regardless of whether they had made a departure. This Board's pre-*Silva* statutory analysis had been upheld by the Ninth Circuit. *See Arias-Uribe v. INS*, 466 F.2d 1198 (9th Cir. 1972). In *Tapia-Acuna v. INS*, 640 F.2d 223 (9th Cir. 1981), however, the Ninth Circuit adopted the constitutional position enunciated in *Francis*.

The situation before us is different from that in *Francis*. It does not involve an arguable extension by us of the statutory scope of the waiver. Instead, we are applying the literal language of section 212(c) of the Act as it has been amended by Congress in section 440(d) of the AEDPA, which includes an express preclusion of relief to certain aliens in deportation proceedings. The Immigration Judge and the Service seemingly start with the premise that the administrative case law which led up to the *Francis* decision would apply to an alien in deportation proceedings who "is deportable by reason of having committed [any of the designated criminal offenses]." However, we have not so held. Therefore, the constitutional issue raised by *Tapia-Acuna* and *Francis* is not present in this case.

Moreover, we note in any event that the law presently gives the Attorney General discretionary authority to achieve uniform treatment for aliens who were in exclusion or deportation proceedings prior to April 1, 1997. *See* IIRIRA §§ 309(c)(1), (3), 110 Stat. at 3009-625, 3009-626; 62 Fed. Reg. 10,312, 10,371 (1997) (to be codified at 8 C.F.R. § 240.16) (interim, effective Apr. 1, 1997). And, this is now a closed group of aliens, as any applicant for

admission to the United States after April, 1, 1997, is subject to the newly enacted provisions of the IIRIRA.

## IV.  CONCLUSION

The applicant remains eligible for a waiver under section 212(c) of the Act under the plain meaning of the amendment by section 440(d) of the AEDPA. Accordingly, the record will be remanded to permit the Immigration Judge to consider the applicant's previously submitted section 212(c) application.

**ORDER:**    The appeal is sustained. The record is remanded to the Immigration Judge for further proceedings consistent with this opinion and for the entry of a new decision.