**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YEWHALASHET ABEBE,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,

*Respondent.*

No. 05-76201

Agency No.
A026-810-941

ORDER

Filed August 18, 2009

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Andrew J. Kleinfeld, Sidney R. Thomas, Barry G. Silverman,
Ronald M. Gould, Richard C. Tallman, Richard R. Clifton,
Consuelo M. Callahan, Carlos T. Bea and N. Randy Smith,
Circuit Judges.

Order;
Dissent by Judge Berzon

---

## ORDER

The petition for en banc panel rehearing and the petition for
full court rehearing en banc are denied. *See* Fed. R. App. P.
40; Fed. R. App. P. 35; Cir. R. 35-3.

BERZON, Circuit Judge, with whom PREGERSON, REINHARDT, THOMAS, WARDLAW, W. FLETCHER, and PAEZ, Circuit Judges, join, dissenting from denial of full court rehearing:

The en banc majority opinion in this case reverses a thirty year old precedent; does so in answer to a question not raised or briefed by either party; comes to a conclusion in conflict with that of the Attorney General and the rule applied in every circuit, as well as in conflict with the necessary assumption of a Supreme Court case, *INS v. St. Cyr*, 533 U.S. 289 (2001); and in doing so distorts the fundamental premises of equal protection law. Moreover, there was no reason whatsoever to embark on this ill-fated adventure, as the concurrence joined by three members of the en banc court persuasively shows.

Although this court has never held a full court en banc, the partial court en banc process depends upon en banc panels sticking to issues appropriately before them and taking heed of the ramifications of their decisions for broad, unrelated areas of law. Here the bare panel majority did neither. If ever a case merited full court en banc consideration, this one did.

## I.   BACKGROUND

In his deportation proceeding, Abebe, a lawful permanent resident ("LPR"), argued that he was eligible for discretionary relief from deportation, invoking the now-repealed INA § 212(c), which provided that "[a]liens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily . . . and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General without regard to the provisions of subsection (a) [(establishing classes of excludable aliens)]." Immigration and Naturalization Act, 8 U.S.C. § 1182(c) (repealed 1996). Although § 212(c) by its terms applied only to LPRs in exclusion proceedings, "through a decades-long series of administrative and judicial decisions,

the Attorney General's statutory authority to grant relief from *exclusion* has been interpreted to carry with it a similar authority to grant relief from *deportation* under certain circumstances." *Abebe v. Gonzales*, 493 F.3d 1092, 1095 (9th Cir. 2007). And, under the Supreme Court's decision in *St. Cyr*, even though § 212(c) was repealed in 1996, relief remains available to aliens who pled guilty prior to the effective date of the repeal and who "would have been eligible for § 212(c) relief at the time of their plea under the law then in effect." 533 U.S. at 326.

The *Abebe* three-judge panel of which I was a member held that in Abebe's particular circumstances, a recent agency regulation validly precluded relief. *See* 8 C.F.R. § 1212.3(f)(5). I concurred on the ground that *Komarenko v. INS*, 35 F.3d 432 (9th Cir. 1994), precluded the contrary conclusion, but urged en banc consideration of *Komarenko*. The court then decided to hear the case en banc, presumably to consider the continued viability of *Komarenko*.

I continue to believe that *Komarenko* was wrongly decided, as Judge Thomas's en banc dissent explains, and should be overruled. *Abebe v. Mukasey*, 554 F.3d 1203, 1217-1218 (9th Cir. 2009) (Thomas, J., dissenting). For present purposes, however, the dispute over whether *Komarenko* was rightly or wrongly decided doesn't matter, because what the en banc court ultimately addressed was an entirely different question.[1] A six-judge majority of the en banc panel sidestepped the *Komarenko* question altogether and instead overruled a prior opinion, *Tapia-Acuna v. INS*, 640 F.2d 223, 225 (9th Cir. 1981), the validity of which *Komarenko* assumed. *See Abebe*, 554 F.3d at 1207. Yet, no party to the case had suggested this course, and there was no briefing on it.[2]

---

[1] Judge Clifton's concurrence and Judge Thomas's dissent in the en banc panel decision set out the parameters of the *Komarenko* issue.

[2] The subject of *Tapia-Acuna*'s validity was discussed only briefly at oral argument. At approximately the thirty-five minute mark, Chief Judge

Overruling *Tapia-Acuna* was not only a bolt from the blue, it was entirely unnecessary to the result the majority reached (as Judge Clifton's concurrence shows), and was based on a fundamental misunderstanding of *Tapia-Acuna's* holding. Even more disturbing, the en banc majority's overruling of a nearly thirty-year-old precedent *does not resolve the equal protection issue before the three-judge panel and the en banc court in this case*, and, by pretending that it does, clashes resoundingly with Supreme Court and Ninth Circuit case law.

To illustrate this last, supervening problem: Imagine Abebe is in one courtroom in Immigration Court, and another LPR — let's call him Joe — is in a courtroom down the hall. Years earlier, both Abebe and Joe were convicted of the same crime in the same state court. The Department of Homeland Security (DHS) now wants to remove both of them on the basis of their state convictions. It charges Joe with deportability[3] on a ground that would also make him inadmissible (say, the ground of having been convicted of a crime involving moral turpitude), whereas it charges Abebe with deportability on a ground that would not make him inadmissible (say, the ground of having been convicted of an aggravated felony). Both Abebe and Joe seek to apply for relief from removal under the former INA § 212(c). Following the "statutory

Kozinski asked Respondent's counsel, "Is it correct to say that if *Tapia-Acuna* were overruled, if it weren't on the books, the *Komarenko* problem would drop out altogether?" Respondent's counsel answered, "I think that's right. I think that's right." When Judge Callahan asked Respondent's counsel to clarify his answer, he stated, "Well, certainly you don't need to overrule it. Arguably, you could clarify it and say that we think *Komarenko* was correctly decided, because *Komarenko* of course was based on the validity of *Tapia-Acuna*, so the Court I suppose could clarify *Tapia-Acuna* if it wished. But certainly it does not need to *overrule* [*Tapia-Acuna*]." Respondent's counsel never argued that *Tapia-Acuna* *should* be overruled.

[3]Following the en banc majority's usage, *see Abebe*, 554 F.3d at 1205, n.3, I use the terms "deportability" and "removability," and the terms "excludability" and "inadmissibility," interchangeably throughout this opinion.

counterpart" rule, codified at 8 C.F.R. § 1212.3(f)(5), the Immigration Judge (IJ) rules that Joe is eligible to apply for such relief because his charged ground has a statutory counterpart in inadmissibility. Following the same regulation, the IJ in Abebe's case, down the hall, rules that Abebe is not eligible to apply for relief and orders him removed.

Abebe then comes to us — as he in fact did — to complain that he's been denied equal protection of the laws, because the class of deportable LPRs to which he belongs — those who are charged with grounds of deportability that have no statutory counterpart in inadmissibility — is treated differently from another class of deportable LPRs — those charged with grounds of deportability that *would* make them inadmissible, even when both are being deported for committing the same offense. This classification is irrational, says Abebe, so the DHS has to treat me the same as it treated Joe.

What does the majority opinion say in response? Abebe, it says, you have no complaint, because *both* you and Joe should have been — or at least could have been — deported. DHS doesn't have to make § 212(c) relief available to *any* deportable aliens; we erred thirty years ago in *Tapia-Acuna* when we said that it did.

That answer both misapprehends and is wholly unresponsive to Abebe's equal protection claim. The core of equal protection law is classification, not entitlement. That *neither* Abebe nor Joe may be *entitled* to apply for § 212(c) relief does not change the fact that the government applied a policy classifying Joe as eligible and Abebe as ineligible, and proposes to throw Abebe but not Joe out of this country. That policy either violates equal protection, or it doesn't. Overruling *Tapia-Acuna* does not tell us whether Abebe's constitutional right to equal protection was violated, it just distorts equal protection law.

## II.  *TAPIA-ACUNA*

Again, in overruling *Tapia-Acuna*, the en banc panel decided a question that was never briefed or argued by either party. The panel did not call for briefs on the question, and it was mentioned in oral argument only in passing. To decide a question that involves overruling a nearly thirty-year-old opinion of this Court — concurred in by the agency and consistent with the law of the only other circuit to have considered the question — without providing notice to the parties that such a question is in play and without soliciting their positions, is both unprecedented and inconsistent with the goal of informed decisionmaking toward which we strive.

The resulting opinion demonstrates that there is good reason why en banc panels — or any panels — don't usually destroy foundational decisions with no input from the parties. The en banc majority characterizes *Tapia-Acuna* as holding "that there's no rational basis for providing section 212(c) relief from inadmissibility, but not deportation." *Abebe*, 554 F.3d at 1207. The majority suggests it was *Tapia-Acuna* and its Second Circuit counterpart, *Francis v. INS*, 532 F.2d 268 (2d Cir. 1976), that forced the agency to extend § 212(c) relief to aliens in deportation proceedings in the first place. *Id.* at 1205.

Not so. In fact, the agency had been extending § 212(c) relief to aliens in deportation proceedings for decades *before Francis* and *Tapia-Acuna* were decided. In 1940, the Attorney General held that the Seventh Proviso of the 1917 Immigration Act permitted him to grant nunc pro tunc deportation waivers to LPRs who had traveled abroad and been readmitted, but who were subsequently placed in deportation proceedings because of a conviction that could have been the basis for an inadmissibility charge. *Matter of L-*, 1 I. & N. Dec. 1 (AG 1940). Although the Immigration and Nationality Act of 1952 replaced the Seventh Proviso with the slightly differently worded INA § 212(c), the Attorney General held

in 1955 that Congress intended § 212(c) relief to be available to LPRs in deportation proceedings, just as the Seventh Proviso had been. *Matter of S-*, 6 I. & N. Dec. 392 (BIA 1954, AG 1955).

Thus, by the time the Second Circuit decided *Francis* in 1976, it was settled agency interpretation that § 212(c) relief was available to certain LPRs in deportation proceedings — i.e., those who had traveled abroad after their conviction, were readmitted without being charged with inadmissibility, and were later placed in deportation proceedings. *Francis* did not question the agency's statutory authorization to grant § 212(c) relief nunc pro tunc to LPRs in deportation proceedings. Instead, it held that, if the agency did so, the equal protection component of the Fifth Amendment required that relief also be available to LPRs who had *not* traveled abroad prior to being placed in deportation proceedings, ruling that there is no rational basis to discriminate between LPRs in deportation proceedings who had previously traveled abroad and LPRs in deportation proceedings who had not.

Later that same year, in *Matter of Silva*, 16 I. & N. Dec. 26 (BIA 1976), the BIA acquiesced in *Francis* in all circuits except ours, where contrary precedent was controlling. *See Arias-Uribe v. INS*, 466 F.2d 1198 (9th Cir. 1972). Several years later, in *Tapia-Acuna*, we overruled *Arias-Uribe* and, following the Second Circuit's position in *Francis* and the BIA's acquiescing opinion in *Silva*, held that aliens in deportation proceedings who had traveled abroad and aliens in deportation proceedings who had not traveled abroad must be treated the same so long as they are otherwise similarly situated. In other words, *Tapia-Acuna* just brought us into line with the law as applied by the then-INS and in the all other circuits.

The majority, ignoring this evolution, provides a superficial explanation of why Congress might rationally have limited § 212(c) relief to admitted aliens: It might have wanted to

"create an incentive for deportable aliens to leave the country[,]" because the relief available upon reentry would be broader than that available in deportation proceedings, and thus, "[b]y encouraging such self-deportation, the government could save resources it would otherwise devote to arresting and deporting these aliens." *Abebe*, 554 F.3d at 1206. But *Tapia-Acuna* does not involve the comparison of (1) LPRs in deportation proceedings who are currently inside the country with (2) LPRs in exclusion proceedings who are currently at a port of entry and hoping to be readmitted, as the *Abebe* majority assumes. Rather, *Tapia-Acuna* involves the comparison of (3) LPRs in deportation proceedings who had previously departed and returned to the United States with (4) LPRs in deportation proceedings who have not left the United States since their conviction. As Judge Thomas's en banc dissent persuasively argues, the hypothetical cost-saving rationale that the majority suggests might have motivated Congress's differential treatment of aliens in classes (1) and (2) does not pass even the most lenient rational-basis scrutiny, when one recognizes that it is in fact aliens in classes (3) and (4) that *Tapia-Acuna* is comparing, both of whom are in *deportation* proceedings inside the United States, and both of whom the government has had to expend resources to apprehend. *Id.* at 1215-16 (Thomas, J., dissenting).

The upshot is that even if the en banc majority had been deciding a question properly before it, it decided it incorrectly. Moreover, the en banc majority was obliged to square its holding with the Supreme Court's decision in *St. Cyr*, which it does not do. *St. Cyr* simply makes no sense if the majority opinion in this case is right.

In *St. Cyr*, the Supreme Court held that although Congress repealed § 212(c) when it enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, § 212(c) relief must remain available to LPRs whose plea agreements were entered before IIRIRA went into effect, because retroactive application of the amendment would

impermissibly upset the reasonable reliance of aliens who pled guilty to crimes under the pre-IIRIRA regime. *St. Cyr*, 533 U.S. at 323-24 (quoting *Landgraf v. USI Film Prod.*, 511 U.S. 244, 270 (1994)). Importantly for present purposes, the petitioner in *St. Cyr* was in deportation proceedings, not exclusion proceedings, *id.* at 293, yet the Court did not consider that fact an obstacle to his eligibility to § 212(c) relief. Before reaching the merits of St. Cyr's retroactivity argument, the Supreme Court recounted the legislative history of § 212(c) and cited *Matter of Silva*, the BIA opinion in which the agency acquiesced in the very equal protection analysis that the en banc majority in this case has thrown overboard, for the understanding that § 212(c) relief was available:

> Like [the Seventh Proviso], § 212(c) was literally applicable only to exclusion proceedings, but it too has been interpreted by the Board of Immigration Appeals (BIA) to authorize any permanent resident alien with 'a lawful unrelinquished domicile of seven consecutive years' to apply for a discretionary waiver from deportation. *See Matter of Silva*, 16 I. & N. Dec. 26, 30 (1976) (adopting position of *Francis v. INS*, 532 F.2d 268 (C.A.2 1976)).

*St. Cyr,* 533 U.S. at 295. *St. Cyr* did not question this reading of § 212(c). Instead, it proceeded on the understanding that § 212(c) relief *was* available in both deportation and exclusion proceedings, necessarily assuming that, as *Silva* and *Francis* had ruled, there was no rational basis to distinguish between LPRs in deportation proceedings who had traveled abroad and those who had not.

The en banc majority's decision to overrule *Tapia-Acuna* (this Circuit's counterpart to *Francis v. INS*) and implicitly to invalidate the regulation allowing § 212(c) to be administered to LPRs in deportation proceedings thus undermines the first premise of *St. Cyr.* Indeed, the en banc majority in this case would seem to revive the very unfairness rectified in *St. Cyr*

— namely, making deportable aliens who relied on the agency's practice with regard to granting waivers from deportation by pleading guilty to crimes from which they might have received waivers under § 212(c) relief under the applicable law at the time they pled. Now, those aliens are back in the same position, because the basis for granting them a waiver from deportation has been torn to shreds — with notice to no one — by the en banc majority in this case.

## III.   EQUAL PROTECTION

But — while bad enough — that's not the worst of what the en banc majority has done. It decides a question that not only was not raised, but that has nothing to do with settling the equal protection challenge that *was* raised.

The first step in an equal protection analysis is to determine what classification *has been applied* to the petitioner. As the forgoing discussion shows, Abebe's status as a deportable alien and his prior travel history are utterly beside the point in deciding whether he was denied equal protection of the law, as those two classifications had nothing to do with why the agency held him ineligible. Instead, the BIA held Abebe ineligible for § 212(c) relief because he fell on the wrong side of the agency's statutory counterpart rule. Under that rule, as between deportable aliens who have not left the United States, the agency will not remove those charged with removal based on a statutory ground that has an exclusion counterpart, but will remove those charged with a removable ground with no such counterpart — even if both committed the same crime.

We explained in *Servin-Espinoza v. Ashcroft*, 309 F.3d 1193 (9th Cir. 2002), applying *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County*, 488 U.S. 336 (1989), that when confronted with an equal protection challenge to an administrative policy, we must analyze the rationality of the classification the agency is *actually* making and applying to the petitioner, not the rule the governing statute establishes, if

the two are different. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886) ("Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority . . . so as practically to make unjust and illegal discriminations between persons in similar circumstances . . . the denial of equal justice is still within the prohibition of the [C]onstitution."); *McQueary v. Blodgett*, 924 F.2d 829, 835 (9th Cir. 1991) ("To conclude that the relevant Washington sentencing law is evenhandedly *applicable* does not entirely dispose of the matter, however. The equal protection clause also requires that the law be evenhanded *as actually applied.*") (emphases in original).

*Servin-Espinoza* involved "an equal protection challenge to an administrative policy that violated a statutory command." 309 F.3d at 1197.[4] The government argued that, because the governing *statute* created a classification that was supportable on rational basis review and that would have rendered the petitioner ineligible for the benefit he sought, no equal protection violation had occurred. *Id.* at 1196. *Servin-Espinoza* held that the rationality of the statute's classification was beside the point, because it was not the statute's classification that had been applied to the petitioner to deny him the benefit, but

---

[4]Coincidentally, the administrative policy at issue in *Servin-Espinoza* was also related to the provision of § 212(c) relief. *Servin-Espinoza* addressed the narrow question whether the INS violated equal protection when it denied § 212(c) relief to deportees during the window of time between the BIA's decision in *In re Fuentes-Campos*, 21 I. & N. Dec. 905 (BIA 1997) (which held that AEDPA § 440(d), which barred § 212(c) relief, operated against LPRs in deportation proceedings but not those in exclusion proceedings) and our decision in *United States v. Estrada-Torres*, 179 F.3d 776 (9th Cir. 1999) (which held that the BIA's interpretation in *Fuentes-Campos* was contrary to the meaning of the statute). I do not cite *Servin-Espinoza* for its substantive § 212(c) holding, however, or even for its proposition that a more demanding variant of rational basis review might apply to an administrative policy in violation of a statutory command. Rather, I cite it only for the manner in which it went about identifying the relevant classification to which equal protection analysis had to be applied.

rather a different classification fashioned by administrative policy. Following the Supreme Court's analysis in *Allegheny Pittsburgh*, which similarly considered an equal protection challenge to a tax assessment policy that violated a state tax law, *see* 488 U.S. at 346, *Servin-Espinoza* directed its equal protection inquiry at the classification the agency had *actually* applied to the petitioner.[5]

Applying that common-sense understanding here clarifies where the en banc majority went fundamentally wrong. Abebe's argument is that the agency's application of its statutory counterpart rule violated his equal protection rights. He does not complain of the statute's apparent classification of LPRs in exclusion proceedings as eligible and those in deportation proceedings as ineligible (a classification the agency has ignored for decades). Nor does he complain of the agency's former rule that deportees were eligible for § 212(c) waivers only if they had previously traveled abroad (a rule invalidated by *Francis* and *Tapia-Acuna*, and renounced by the agency in *Matter of Silva*). And no wonder — neither of these rules was applied to him. Thus, the en banc majority's overruling of *Tapia-Acuna* does nothing to resolve Abebe's equal protection challenge one way or the other, because the

---

[5]That is not to say, of course, that an alien who is simply denied a benefit for a reason that is in violation of statutory authority necessarily has an equal protection claim. What we have here is an agency policy formally enunciated and consistently and long-applied, approved in BIA case law and embodied in a formally promulgated regulation. *See Servin-Espinoza*, 309 F.3d at 1198 (noting that the INS policy was a proper focus for equal protection analysis because it "systematically favored excludables over deportables. This difference in treatment was not isolated or sporadic [but] . . . based on a policy formally announced . . . [by the BIA] and consistently followed [by the agency] . . . .") (citation omitted); *compare Chan v. Reno*, 113 F.3d 1068, 1074 (9th Cir. 1997) (rejecting equal protection challenge based on the allegation that the INS treated another alien more favorably than the petitioner because "[a]ny other conclusion would create an absurd result: whenever the INS granted an alien relief to which he was not entitled, any future attempts to apply the law correctly would generate an equal protection claim.").

classification *Tapia-Acuna* held to be invalid was simply not the distinction applied to Abebe to make him ineligible for relief.

Put another way, what the majority's approach misses is that the core of the equal protection right is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). "When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier . . . ." *Id.*; *see also Turner v. Fouche*, 396 U.S. 346, 362 (1970) ("We may assume that the [plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications"). Whether Abebe was *entitled* to § 212(c) relief as a person in deportation rather than exclusion proceedings is thus entirely irrelevant to his core equal protection challenge.

Once we have isolated the proper focus of the equal protection analysis, it becomes clear that there is no avoiding the *Komarenko* question. Either there is a rational basis for the statutory counterpart classification — the classification actually applied — or there is not.

Perhaps recognizing that overruling *Tapia-Acuna* doesn't get it where it needs to go, the en banc opinion attempts to obviate the need for an equal protection analysis altogether, by stating that "[u]nder its plain language, section 212(c) gives the Attorney General discretion to grant lawful permanent residents relief only from *inadmissibility*—not deportation." *Abebe*, 554 F.3d at 1205. It then reasons that "[s]ince petitioner was not eligible for section 212(c) relief in the first

place, the BIA could not have committed an equal protection violation by denying him such relief." *Id.* at 1207.

That leap is simply wrong, as should be apparent by now. Again, equal protection law is concerned with *equal treatment*, not with entitlement. If a governmental agency misinterpreted a statute to require that all schoolchildren be given $5.00 — or if a court mistakenly held that the Constitution required that all schoolchildren be given $5.00 — but the agency then gave the $5.00 only to white children, not to blacks or Asians, it would be no answer to the equal protection claim by black or Asian children that neither they nor the white children were entitled to the $5.00 in the first place. Similarly, if, as here, there is a regularly applied, official administrative policy conferring eligibility for § 212(c) relief on one group of deportees but not another, that policy is not exempt from the equal protection clause's strictures because the agency misconstrued the statute, or because the equal protection analysis that generated the agency's approach to applying the statute was wrong. Either way, the on-the-ground result was based on a second-level classification, which was the one *actually applied* to Abebe, and which either is or is not an irrational classification of similarly situated LPRs. The lack of entitlement might become relevant at the remedy stage, but it is not relevant at the violation stage.[6]

Pertinent to any remedy stage is the majority's suggestion that its decision might prompt the agency "to reconsider [8 C.F.R. § 1212.3(f)(5)], and eventually repeal it," thus ceasing

---

[6]The majority later maintains that, plain language notwithstanding, "[t]he INS may certainly choose to treat different classes of aliens the same, even though the statute does not." *Abebe*, 554 F.3d at 1207. That is not right either, as an agency has the discretion to act only within the boundaries allowed by its governing statute. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). If providing relief to deportees is foreclosed by the plain language of the statute, the agency may not elect to do otherwise. It could, however, be required to do so as a matter of constitutional mandate — which is exactly what happened in *Francis*.

to offer § 212(c) waivers to all deportees. *Id*. There are two problems with this suggestion as a solution to the *real* equal protection problem raised here, both of which stem from the fact that providing § 212(c) relief to deportees is long-established agency policy.

First, as *Servin-Espinoza* explained, again relying on the Supreme Court's holding in *Allegheny Pittsburgh*, an agency's perfectly proper change of policy going forward does not in any way mitigate a past equal protection violation, or provide a remedy for it. *See Servin-Espinoza*, 309 F.3d at 1199 ("In this case, as in *Allegheny Pittsburgh*, the proper remedy under the equal protection guarantee is to provide equality of treatment. Because we cannot turn back the hands of time and erase the favorable treatment of excludable aliens, the only feasible way to remedy the discrimination suffered by Servin-Espinoza is to grant him the same opportunity to apply for § 212(c) relief that was systematically granted to [similarly situated] excludable aliens . . . ."). So, if the majority had decided that *Komarenko* erroneously approved an impermissibly irrational classification, the only proper relief would have been to direct the agency not to deport Abebe and allow him the opportunity to apply for § 212(c) relief.

Second, if the agency takes up the majority's invitation and precludes relief in the future to all deportees, we could have a second *St. Cyr* on our hands. *St. Cyr* held that a legislative change — the passage of the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), repealing the former § 212(c) — could not apply retroactively to deny relief to LPRs who entered guilty pleas prior to IIRIRA's passage, because such retroactive application would "clearly attach[ ] a new disability[ ] in respect to transactions or considerations already past." 533 U.S. at 321 (internal quotation omitted). *St. Cyr* thus mandated that § 212(c) relief remain available for LPRs who entered guilty pleas, just as it was available prior to IIRIRA and/or AEDPA. On *St. Cyr*'s logic, a repeal of the agency's longstanding policy making

relief available to deportees would quite possibly fare no better on a retroactivity analysis, at least as applied to those who were convicted via guilty plea (as was Abebe).

And what if the agency declines the invitation, and continues to apply the statutory counterpart rule and the corresponding regulation as it is currently written? If that happens, we will have to decide the viability of *Komarenko* all over again, because the en banc majority opinion has not decided whether the statutory counterpart rule *actually applied* and embodied in 8 C.F.R § 1212.3(f)(5) complies with equal protection.

So, all in all, the majority opinion not only fails to resolve the case before it, but also fails to set an intelligible rule for future cases. Worst of all, the majority opinion makes a hash of equal protection law generally for the future, by allowing courts to consider what the government's classification policy *should be*, rather than what it *is*, when addressing an equal protection claim.

The bottom line is that there is simply no escaping the *Komarenko* question. If the en banc panel was determined to deny Abebe's petition for review, it should have done so by upholding the statutory counterpart rule, affirming *Komarenko* without questioning the validity of *Tapia-Acuna*, as the concurrence would have done.

## IV. CONCLUSION

Among the ultimate goals of the en banc process are ensuring the coherence of our case law, its consistency with Supreme Court law, and, when possible, its agreement with that of the other circuits. With its overruling of *Tapia-Acuna* and its implicit invalidation of a federal regulation, the en banc majority in *Abebe v. Mukasey* has advanced none of these goals. Instead, it has casually overturned nearly thirty years of our own case law and an even longer period of settled agency interpretation, throwing future agency practice into

uncertainty. It has created a conflict with the only other circuit court to have considered the question directly, *see Francis*, 532 F.2d 268, with the law actually applied by the agency and by every other circuit, and with the underpinnings of the Supreme Court's decision in *St. Cyr*. More broadly, the distorted analysis of Abebe's equal protection claim threatens our most basic understandings of equal protection law, with ramifications for cases in entirely different substantive areas.

For all these reasons, I respectfully dissent from the decision not to reconsider this indefensible opinion in a full court en banc.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.