# In re Sergio NOLASCO-Tofino, Respondent

## File A74 985 878 - New York

*Decided April 15, 1999*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

For purposes of determining eligibility for suspension of deportation, the period of continuous physical presence ends at the service of the Order to Show Cause and Notice of Hearing (Form I-221) on the alien, irrespective of the date that it was issued.

James J. Kelly, Esquire, Brooklyn, New York, for respondent

Thomas P. McGrath, Assistant District Counsel, for the Immigration and Naturalization Service

Before: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEIL-MAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, GRANT, SCIALABBA, and MOSCATO, Board Members. Concurring Opinion: ROSENBERG, Board Member, joined by VILLAGELIU and GUENDELSBERGER, Board Members.

HURWITZ, Board Member:

In a decision dated June 26, 1997, the Immigration Judge found the respondent deportable and pretermitted his application for suspension of deportation under section 244(a)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(1) (1994), but granted him the privilege of voluntary departure. The respondent has appealed from the pretermission of his application for suspension of deportation. The appeal will be dismissed.

## I. BACKGROUND

The respondent is a 25-year-old male native and citizen of Mexico who entered the United States on or about May 17, 1989. On March 26, 1996, the Immigration and Naturalization Service issued an Order to Show Cause and Notice of Hearing (Form I-221) and placed the respondent in deportation proceedings. On July 17, 1996, the respondent appeared at his master

calendar hearing and declared his intention to seek suspension of deportation. On October 9, 1996, the respondent filed an application for that relief. At the merits hearing of June 26, 1997, however, the Immigration Judge pretermitted the application, observing that the respondent had not acquired 7 years' continuous physical presence in the United States prior to the issuance and service of his Order to Show Cause. Citing our decision in *Matter of N-J-B-*, 21 I&N Dec. 812 (BIA 1997),[1] the Immigration Judge concluded that the respondent was prima facie ineligible for suspension of deportation.

On appeal, the respondent argues that the pretermission of his application is based on an improper retroactive application of new law. The respondent maintains that his case is subject to prior law, which requires him to accumulate the requisite 7 years' presence prior to the filing of his application for relief, rather than prior to the issuance of his Order to Show Cause. The respondent also asserts that the decision of the Immigration Judge is fatally flawed because it relies on *Matter of N-J-B-*, which had been vacated since the time of the hearing. Alternatively, the respondent contends that the new law violates due process because it discriminates between classes of aliens without a rational basis.

In response, the Service cites the recent changes in the law and maintains that the respondent is not eligible for suspension of deportation because he has not shown the period of continuous physical presence required by the revised statute.

## II. ISSUE

The issue in this case is whether the provision for calculating continuous physical presence in section 240A(d) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d) (Supp. II 1996) (the "stop time rule"), applies to applications for suspension of deportation.

## III. RECENT DEVELOPMENTS IN THE LAW

At the time the respondent first indicated his interest in suspension of deportation, that relief was governed by section 244(a) of the Act. Section 244(a) required, inter alia, that an applicant for suspension of deportation be physically present in the United States for a continuous period of at least 7 years immediately preceding the date of application.

---

[1] Our decision in *Matter of N-J-B-* was subsequently vacated by the Attorney General. Att'y Gen. Order No. 2093-97 (July 10, 1997).

On September 30, 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), was enacted. The IIRIRA eliminated the relief of suspension of deportation and substituted a similar remedy, cancellation of removal, at section 240A of the Act. *See* IIRIRA §§ 304(a)(3), 110 Stat. at 3009-594; 308(a)(7), 110 Stat. at 3009-615. It also introduced into the law a provision that closes, or "stops," the period of continuous physical presence upon the service of a charging document on the alien, which is referred to as a "notice to appear." *See* section 240A(d)(1) of the Act. This "stop time" rule applies to notices to appear issued before, on, or after the IIRIRA's enactment date. *See* IIRIRA § 309(c)(5), 110 Stat. at 3009-627.

In *Matter of N-J-B-*, *supra*, we examined and interpreted section 309(c)(5) of the IIRIRA to determine the scope of its transitional rules. In that case, we concluded that the stop time rule applies to applications for suspension of deportation that were pending at the time the IIRIRA took effect. Subsequent to the respondent's appeal, the Attorney General vacated our decision in *Matter of N-J-B-* and announced that a substitute order would be forthcoming.

Before a new order was issued, however, the President signed into law the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997), *amended by* Pub. L. No. 105-139, 111 Stat. 2644 (1997) ("NACARA"). This law revised certain sections of the IIRIRA, including the transitional provisions for suspension of deportation. *See* NACARA § 203(a), 111 Stat. at 2196. It provided that the stop time rule applies to Orders to Show Cause issued before, on, or after the IIRIRA's enactment date. *Id.*

## IV. STATUTORY ELIGIBILITY FOR SUSPENSION OF DEPORTATION

For purposes of our review, the respondent's eligibility for suspension of deportation hinges on which methodology is used to compute his period of continuous physical presence. Under the methodology of prior law, the respondent may be eligible for suspension of deportation because he had acquired the requisite period prior to the time he tendered his application for suspension of deportation. Under the methodology of current law, the respondent is prima facie ineligible for relief because he had not acquired the requisite period prior to the service of his charging document. Based on the amended language of the IIRIRA and its legislative underpinnings in the NACARA, we find that the stop time rule applies to applications for suspension of deportation.

## A. Revisions Made by the NACARA

As a general matter, persons in deportation or exclusion proceedings that had begun before April 1, 1997, are not subject to the changes made by the IIRIRA. IIRIRA § 309(c)(1), 110 Stat. at 3009-625.[2] This general grandfathering provision does not apply, however, where the statute expressly provides otherwise. *Id.*

As originally enacted, the IIRIRA contained a single provision that addressed pending suspension of deportation cases. That provision, which was entitled "Transitional Rule with Regard to Suspension of Deportation," read as follows:

> Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act.

IIRIRA § 309(c)(5), 110 Stat. at 3009-627.

The NACARA recast that provision as a general rule, complemented by specific exceptions. This general transitional rule essentially tracks the IIRIRA's original wording, but substitutes the reference to "notices to appear" with the following language regarding "orders to show cause":

> IN GENERAL.—Subject to subparagraphs (B) and (C), paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to orders to show cause (including those referred to in section 242B(a)(1) of the Immigration and Nationality Act, as in effect before the title III-A effective date), issued before, on, or after the date of the enactment of this Act.

IIRIRA § 309(c)(5)(A), *as amended by* NACARA § 203(a)(1), 111 Stat. at 2196.[3] This language is effective as though included in the IIRIRA and remains in effect today. NACARA § 203(f), 111 Stat. at 2200. It is this language that we must interpret.

## B. Plain Meaning of the IIRIRA's General Transitional Rule

In interpreting the general transitional rule of the IIRIRA, we look first

---

[2]The April 1, 1997, date is derived from a formula in section 309(a), which provides that the general effective date for this title of the IIRIRA is the first day of the first month beginning more than 180 days after the date of the IIRIRA's enactment, which was September 30, 1996. IIRIRA § 309(a), 110 Stat. at 3009-625.

[3]Subparagraphs (B) and (C) of the transitional rules identify the cases to which the general rule does not apply: respectively, cases in which the Attorney General elects to terminate deportation proceedings and initiate removal proceedings in their place, and certain classes of aliens who have been granted temporary protection from deportation. Those exceptions are not implicated in this case, because the respondent remains in deportation proceedings and does not fall within any of the classes of aliens who qualify for special treatment under the NACARA. *See* IIRIRA § 309(c)(5)(C), *as amended*.

to the precise language of the statute as it currently exists. The paramount index of congressional intent is the plain meaning of the words used in the statute taken as a whole. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *Matter of Michel*, 21 I&N Dec. 1101 (BIA 1998). Where the language is clear, we must give effect to the unambiguously expressed intent of Congress. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). On its face, we find the revised language of section 309(c)(5)(A) of the IIRIRA to be unambiguous.

The IIRIRA, as revised by section 203(a)(5) of the NACARA, contains "Transitional Rules With Regard to Suspension of Deportation." Since the IIRIRA removed suspension of deportation from the Act, we glean from this title that Congress intended these rules to apply to suspension of deportation applications pending as of the date the IIRIRA's changes took effect.

Under these transitional rules, the general provision applies the stop time rule of section 240A(d) of the Act to all Orders to Show Cause, irrespective of the date of issuance. We read this language as requiring us to apply the stop time rule of cancellation of removal to all pending applications for suspension of deportation, unless expressly exempted from the general rule.

## C. NACARA's Revision of the General Transitional Rule

While we find the language of the general transitional rule to be unambiguous, we observe that this language is the product of legislative refinement, which itself reflects congressional purpose. Accordingly, we look to the implementing statute to confirm that our reading of the general transitional rule is consistent with the legislative intent underlying it. *See Matter of Fuentes-Campos*, 21 I&N Dec. 905 (BIA 1997); *Matter of W-F-*, 21 I&N Dec. 503 (BIA 1996); *cf. Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285 (1956) ("'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'") (quoting *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122 (1850)).

In ascertaining the plain meaning of a statutory provision, we construe the language in harmony with the wording and design of the statute as a whole. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *Matter of Fuentes-Campos, supra*. The introduction or extraction of language sheds light on the congressional intent behind the legislation. *Russello v. United States*, 464 U.S. 16, 23 (1983); *cf. Matter of Grinberg*, 20 I&N Dec. 911 (BIA 1994).

The NACARA modified the IIRIRA's transitional rule in two significant ways. First, it amended section 309(c)(5) of the IIRIRA to replace the reference to "notices to appear" with "orders to show cause." In addition, it partitioned section 309(c)(5) into subsections containing the general tran-

sitional rule and the particularized exceptions to the general rule.

## 1. Substitution of Charging Documents

When Congress collapsed deportation and exclusion into removal proceedings, it excised from the Act all references to "order to show cause" and inserted "notice to appear" wherever reference to a charging document was made.[4] We can reasonably infer from these revisions that Congress chose to remove from the Act a term of art that had been rendered obsolete.

Although Congress eliminated all references to "orders to show cause," it did not direct that proceedings currently being conducted in deportation or exclusion be terminated and reinitiated in removal. *See* IIRIRA § 309(c)(2), 110 Stat. at 3009-626 (leaving termination and reinstitution of proceedings to the discretion of the Attorney General). Rather, Congress allowed existing proceedings to continue uninterrupted and to conclude in their normal course, reserving the new system for proceedings initiated after the IIRIRA took effect. *See* IIRIRA § 309(c)(1), 110 Stat. at 3009-625. Therefore, deportation and removal proceedings temporarily coexist in time.

In its original form, section 309(c)(5) of the IIRIRA provided that all notices to appear, irrespective of the date of issuance, are subject to the stop time rule of the newly created section 240A(d) of the Act. The transitional rule for suspension of deportation referred to the "notices to appear" and thus created the confusion we sought to resolve in *Matter of N-J-B-, supra*.

Section 203 of the NACARA clarifies the transitional rule through the substitution of the term "orders to show cause" for "notices to appear." Read simply, section 309(c)(5)(A) states that the stop time rule applies generally to cases in which an Order to Show Cause has been issued, i.e., deportation cases. We glean from the extraction of the term "notices to appear" that Congress does not mean to limit the stop time rule to cases brought in or reinstituted in removal proceedings. To the contrary, we observe the transitional rule to apply broadly and immediately to applications for relief in deportation proceedings, as evidenced by the comprehensive inclusion of Orders to Show Cause "issued before, on, or after" the IIRIRA's effective date. In fact, given the breadth of this language, we discern a clear legislative intent to apply the stop time rule to all applications for this particular type of relief, whether in the form of suspension of deportation or cancellation of removal.

---

[4]As a term of art, "order to show cause" was introduced into the Act fairly recently, when Congress enacted stricter rules regarding deportation proceedings conducted in absentia. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 545, 104 Stat. 4978, 5061-62. Prior to that, orders to show cause were a creature of regulation. *See Understanding the Immigration Act of 1990* 10-5 (Stephen Yale-Loehr ed., 1991).

## 2. Recitation of Exceptions

The second significant change in section 309(c)(5) of the IIRIRA is the lengthy articulation of the classes of aliens who are not subject to the stop time rule of 240A(d) of the Act. The concerted effort of Congress to identify, with considerable particularity, those individuals who are exempt from the general rule enhances the comprehensive nature of the general rule and underscores a congressional intent to apply the stop time rule as universally as possible. *Cf.* 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.11, at 144-45 (4th ed. 1984) (observing that exceptions may clarify that the general rule applies to all not excepted). The carefully articulated exceptions to the general transitional rule reinforce our conclusion that Congress intended to apply the general rule as broadly as possible and therefore apply the stop time rule as comprehensively as possible to applications for like relief.

The NACARA is framed, not as a technical correction to the IIRIRA, but as a clarification of it. *See* NACARA, tit. II, 111 Stat. at 2193; *see also Almendarez-Torres v. United States*, 523 U.S. 224118 S. Ct. 1219, 1226 (1998) (noting that the title of a statute and heading of a section may be used to interpret the statute). The NACARA further developed the transitional provisions of the IIRIRA and, through the modifications discussed herein, better articulated the inclusion of applications for suspension of deportation in the stop time rule. Thus, in addition to finding the language of the general rule to be clear on its face, we also find that Congress intended the language to be read in this manner.

## D. Legislative History of the NACARA

We are satisfied that the plain meaning of section 309(c)(5) of the IIRIRA, as revised, gives effect to the stop time rule in all suspension of deportation cases. We are also satisfied that our reading conforms to the construction of the statute as a whole. We therefore need not resort to legislative history to interpret the language at issue. *Chevron, U.S.A. v. National Resource Defense Council, Inc., supra*.

We are cognizant, however, that section 240A(d)(1) of the Act, which contains the stop time rule, makes no explicit reference to "orders to show cause" or deportation cases.[5] This omission is not problematic to our read-

---

[5]Section 240A(d)(1) of the Act provides:

> For purposes of this section, any period of continuous residence or continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear under section 239(a) or when the alien has committed an offense referred to in section 212(a)(2) that renders the alien inadmissible to the United States under section 212(a)(2) or removable from the United States under section 237(a)(2) or 237(a)(4), whichever is earliest.

ing of the transitional rule when we consider the design of the statute "as a whole." *K Mart Corp. v. Cartier, Inc., supra; Matter of Punu*, 22 I&N Dec. 3364 (BIA 1998). The transitional rules in the IIRIRA are designed to fit expiring constructions and terms of art into a new legal framework and necessarily will resort to the vocabulary of the old law to direct affected parties to the provisions of the new. *See* IIRIRA § 309(d)(2), 110 Stat. at 3009-627 (providing that for purposes of carrying out the Act, any reference to an order of removal includes reference to an order of deportation); *see also United States v. Pantin*, 155 F.3d 91 (2d Cir. 1998), *cert. denied*, 119 S. Ct. 835 (1999); *United States v. Ventura-Candelario*, 981 F. Supp. 868 (S.D.N.Y. 1997), *aff'd*, 164 F.3d 620 (1998), *cert. denied*, 119 S. Ct. 1073 (1999). Given the inherent nature of all transitional rules, we can readily deduce that Congress simply sought to avoid reinserting terminology that had been purposefully removed and rendered superfluous vis-à-vis all other provisions of the Act. *Cf.* 1A Singer, *supra*, § 20.21 (4th ed. 1986) (stating that better legislative drafting dictates that temporary provisions not be placed in the body of the permanent law).

Nonetheless, insofar as the omission might be considered to create an ambiguity in the statute, we look to the legislative history of the NACARA to further demonstrate the congressional intent behind the general transitional rule and the revisions made by the NACARA. *See INS v. Cardoza-Fonseca, supra*, at 432 n.12 (holding that the court may look to the legislative history to determine whether there is "clearly expressed legislative intention" that conflicts with the language used).

The NACARA was passed as part of an appropriations package. *See* District of Columbia Appropriations Act, 1998, Pub. L. No. 105-100, 111 Stat. 2160 (1997). Prior to the addition of the NACARA, that package contained no immigration provisions, and even after its addition, the pertinent committee report made no reference to the NACARA or its provisions. *See* S. Rep. No. 105-75 (1997), *available in* 1997 WL 583231.

When the Senate passed the bill containing the NACARA, however, the Senate directed the Appropriations Committee, under a unanimous-consent agreement, to prepare an explanatory statement on the bill. *See* 143 Cong. Rec. S12658, *available in* 1997 WL 712581. Significantly, this statement was prepared before either the House or the Senate had signed the bill and thus preceded its enrollment and presentation to the President. *See* 2A Singer, *supra*, § 48.04, at 300-02 (stating that the history of legislative events up to the point of enactment may be used to interpret a statute). The explanatory statement asserts its authority at the outset: "The language and allocations set forth in Senate Report 105-75 should be complied with unless specifically addressed to the contrary in the accompanying bill *and statement*." 143 Cong. Rec. S12658 (emphasis added). In the absence of any competing or conflicting record, we are satisfied that this explanatory statement represents the most authoritative articulation of congressional

intent available to us. *Cf.* 2A Singer, *supra*, §§ 48.04, 48.14, at 300-02, 334-35 (stating that committee reports are extensively used as sources of legislative history and that committee member statements are afforded the same weight as formal committee reports).

The explanatory statement contains a section-by-section explanation of the NACARA, as contained in Title II of the bill. The relevant portion of that statement provides in its entirety as follows:

> Section 203 modifies certain transition rules established by IIRIRA with regard to suspension of deportation and cancellation of removal. *The changes state that the "stop time" rule established by that Act in section 240A of the INA shall apply generally to individuals in deportation proceedings before April 1, 1997, with certain exceptions.* They also state that the rule shall not apply to certain applicants for suspension of deportation. . . . The exception includes certain Salvadorans and Guatemalans who were members of the ABC class or applied for asylum by April 1, 1990 and derivatives as specified in the statute, as well as applicants from the former Soviet Union and Eastern Europe who came here by December 31, 1990 and applied for asylum by December 31, 1991 and derivatives as specified in the statute. Section 203 also makes clear that in order to obtain cancellation these individuals have to meet the standards laid out in that section, rather than the ones laid out in section 240A of the INA. Finally, the section provides for temporary reductions in visas available under the "diversity" and "other workers" immigration categories, with the reduction in the latter to take effect after those in the backlog have received visas.

143 Cong. Rec. S12660 (emphasis added). This statement reflects an express intention to apply the stop time rule of section 240A of the Act to deportation cases, not just to removal cases, and to apply that rule generally as of the effective date of the IIRIRA.

When the NACARA was first presented to the House, the Senate Appropriations Committee prepared an explanatory memorandum on the NACARA language specifically. That memorandum contained a section-by-section analysis of the bill, which referred to our decision in *Matter of N-J-B-* by name and endorsed it, explaining as follows:

> *Section 203(a) amends the transition rule governing eligibility for suspension of deportation for those who were in exclusion or deportation proceedings as of April 1, 1997, the effective date of IIRIRA.* Under the rules in effect before then, [an] otherwise eligible person could qualify for suspension of deportation if he or she had been continuously physically present in the United States for seven years, regardless of whether or when the Immigration and Naturalization Service had initiated deportation proceedings against the person through the issuance of an order to show cause ("OSC") to that person. As a result, people were able to accrue time toward the seven-year continuous physical presence requirement after they already had been placed in deportation proceedings.
>
> IIRIRA changed that rule to bar additional time for accruing after receipt of a "notice to appear," the new document the Act created to begin "removal" proceedings, the repatriation mechanism IIRIRA substituted for deportation and exclusion proceedings. Over a strong dissent, a majority of the Board of Immigration Appeals in Mater of N-J-B [sic] interpreted IIRIRA Section 309(c)(5) to apply not only prospec-

> tively in removal cases initiated by means of this new document but also retroactively to those who were in exclusion or deportation proceedings initiated by an order to show cause. On July 10, 1997 Attorney General Reno vacated and took under review the BIA's decision in *Matter of N-J-B-*.
>
> *Section 203(a) generally codifies the majority decision in Matter of N-J-B [sic] by stating explicitly that orders to show cause have the same "stop time" effect as notices to appear.* Excepted from retroactive application of the "stop time" rule are (1) those whose cases are terminated and reinitiated pursuant to IIRIRA Section 309(c)(3); and (2) those who, based on their special circumstances, are eligible for relief from repatriation under this Act, as described below.

143 Cong. Rec. S12265, S12266, *available in* 1997 WL 693186 (emphasis added). The language of section 203(a) of the NACARA, as presented to the House, is the same language that was ultimately enacted.

Although the committee report may itself contain no language about the congressional intent behind the NACARA, these statements reflect, in no uncertain terms, a clear intent by Congress to apply the stop time rule to all but discrete sets of cases. These statements also reflect congressional awareness of the issue raised in *Matter of N-J-B-, supra*, and an intention to resolve that issue through the NACARA's revisions. Thus, we find the legislative history of the NACARA consistent with our interpretation of the transitional rules.

### E. Application of the Stop Time Rule

Accordingly, having considered the language of section 309(c)(5) of the IIRIRA, its construction, and its legislative history, we conclude that section 309(c)(5)(A), as amended by the NACARA, includes applications for suspension of deportation. Therefore, we also conclude that the stop time rule of section 240A of the Act applies to suspension of deportation applications generally, and that only those applications that fall within the ambit of sections 309(c)(5)(B) and (C) of the IIRIRA, as amended, are exempt.[6]

### V. CONSTITUTIONALITY OF CLASS EXEMPTIONS

The respondent argues that the class exceptions made in the NACARA improperly and unconstitutionally draw distinctions between groups of aliens. As a general matter, this Board is without jurisdiction to entertain

---

[6]We are aware that the respondent asserts it would be improper to "retroactively" apply the provisions of the IIRIRA to his case. However, whether or not the statute has a retroactive effect, the outcome is the same since Congress has clearly directed this result. *See Landgraf v. USI Film Products*, 511 U.S. 244 (1994); *United States v. Hemme*, 476 U.S. 558 (1986).

such constitutional arguments. *See Matter of Fuentes-Campos, supra; Matter of C-*, 20 I&N Dec. 529 (BIA 1992). Thus, the propriety of these class exemptions cannot come before us.

## VI. CONCLUSION

The respondent was served with an Order to Show Cause before he had acquired 7 years of continuous physical presence in the United States. Under the transitional provisions of the IIRIRA, as amended by the NACARA, the respondent's period of continuous physical presence concluded when he was served with a charging document. Accordingly, he is unable to satisfy the eligibility requirements for suspension of deportation, and his application for that relief is properly pretermitted.

**ORDER:** The appeal is dismissed.

**FURTHER ORDER:** Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondent shall be deported as provided in the Immigration Judge's order.

*CONCURRING OPINION:* Lory Diana Rosenberg, Board Member, in which Gustavo D. Villageliu, and John Guendelsberger, Board Members, joined

I respectfully concur. On the whole, I believe that the majority's reading of the statute is reasonable and that the result they reach here is correct. I write separately, however, because I am concerned that this decision be placed in the proper context and not be read to unduly restrict eligibility for suspension of deportation.

First, I must qualify my endorsement of the majority's interpretation of the language of the transitional rules regarding suspension of deportation as set forth in section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546, 3009-627, ("IIRIRA"), as amended by the Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, 111 Stat. 2193 (1997) ("NACARA"). I do not agree that the statutory language is plain on its face, as there is an inherent ambiguity between section 309(c)(5) of the IIRIRA, as revised, and section 240A(d)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(d)(1) (Supp. II 1996), which is created by the inconsistent terminology used in those provisions.

As the majority has discussed, one provision speaks exclusively in

terms of deportation proceedings, the other in terms of removal proceedings. The incongruity in terminology introduces sufficient ambiguity to preclude any "plain" reading of the statute, and I necessarily would resort to principles of statutory construction to interpret the transitional rules. *Cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987). Therefore, while the majority's conclusion that section 240A(d)(1) of the Immigration and Nationality Act applies generally to all pending deportation cases is not unreasonable, I am less confident than the majority that the statutory language conveys Congress' intent as clearly as our opinion suggests.

Second, I note that this decision is limited to the question of determining the application of what the majority refers to as the "stop time rule" to circumstances in which 7 years was not accrued prior to the service of the Order to Show Cause. The respondent, having entered in May of 1989, was approximately 2 months shy of the requisite 7 years' continuous physical presence when he was served with an Order to Show Cause in March of 1996. Our decision goes no further than to say that, because he failed to acquire those 7 years before the service of the Order to Show Cause, the IIRIRA's transitional rules for suspension of deportation deem him ineligible for that form of relief. We conclude no more than that the IIRIRA dictates that section 240A(d)(1) applies in this instance.

We have not fully considered the operation of section 240A(d)(1) of the Act for all purposes. In particular, we do not here determine what occurs once a charging document seeking the respondent's removal is issued, and the service of that document brings the accrual of a period of physical presence accumulated prior to its service to a close.[1] Specifically, today's decision does not address whether a respondent might begin anew to accrue time toward future eligibility for relief, *following* the service of a charging document. I emphasize that the Act, the IIRIRA, and the NACARA all are silent on this score, as is our ruling today.

Third, I am concerned lest enthusiasm for settling on a "universal" application of a "stop time" rule that cuts off eligibility for discretionary relief cause us to lose sight of the flexibility of the transitional rules or erroneously assume that such a rule compels unjust results. The result reached by applying the principles of statutory construction to support the majority's reading is not unreasonable and is supported by legislative history, and I therefore do not take issue with the result that we have reached.

---

[1]Sections 309(c)(2) and (3) of the IIRIRA suggest that the service of an Order to Show Cause is not always the determinative factor in calculating the period of continuous physical presence. *See* IIRIRA §§ 309(c)(2), (3), 110 Stat. at 3009-626. Consequently, the majority's reference to the "stop time rule" should not preclude examining the actual language of section 309(c)(5) of the IIRIRA, as amended by Congress in the NACARA. As Abraham Lincoln once said, "If you call a tail a leg, how many legs has a dog? Five? No; calling a tail a leg don't make it a leg." *Bartlett's Familiar Quotations* 458 (Morley ed. 1951).

Nonetheless, looking at the current language of the IIRIRA and the remedial changes made by the NACARA, I discern a legislative goal of simplicity, not stringency.

While Congress may have crafted a one-rule-fits-all scheme, it neither dictated its use nor required its stringent application in every case. To the contrary, Congress gave the Attorney General wide latitude in the handling of transitional cases, granting her the discretion both to apply new procedures to certain pending deportation proceedings, and to terminate certain other pending proceedings and reinitiate them under the IIRIRA provisions applicable to removal proceedings initiated after April 1, 1997. *See* IIRIRA §§ 309(c)(2), (3), 110 Stat. at 3009-626, *as amended by* NACARA § 203(a)(2), 111 Stat. at 2198; *see also* 8 C.F.R. § 240.16 (1998) (providing that the Attorney General shall have the sole discretion to apply new removal procedures or to terminate certain cases and initiate removal proceedings); *cf. also, e.g., Romero-Morales v. INS*, 25 F.3d 125, 128 (2d Cir. 1994) (finding that the statute and regulations afforded considerable room for the exercise of discretion consistent with equitable and humanitarian concerns).

These transitional provisions reflect that Congress was aware of the potential inequities that might be created by the broad application of the "stop time" rule, and provided the Attorney General a generous grant of discretion through which to ameliorate such harsh consequences. In fact, the effect of the exercise of such discretion would be to assess physical presence from the date of entry through service of the Notice to Appear for such reinitiated proceedings. I therefore emphasize that our decision in no way limits or detracts from the statutory failsafe of the Attorney General's discretion to reinitiate proceedings under section 240A of the Act, as provided under section 309(c)(3) of the IIRIRA. *See* 8 C.F.R. § 240.16.