# United States Court of Appeals
## For the First Circuit

No. 15-1685

GILBERTO SANTOS-QUIROA,

Petitioner,

v.

LORETTA LYNCH, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Lipez, and Thompson,
Circuit Judges.

Stephen A. Lagana and Law Offices of Lagana & Associates on
brief for petitioner.
Michael C Heyse, Trial Attorney, Office of Immigration
Litigation, Civil Division, U.S. Department of Justice, Benjamin
C. Mizer, Principal Deputy Assistant Attorney General, Civil
Division, and Mary Jane Candaux, Assistant Director, Office of
Immigration Litigation, on brief for respondent.

March 5, 2016

**THOMPSON**, **Circuit Judge**.  Petitioner Gilberto Santos-

Quiroa seeks review of a decision from the Board of Immigration

Appeals ("BIA") finding that the so-called "stop-time" rule

applies to his application for suspension of deportation and bars

him from receiving relief.  For the reasons explained below, we

agree with the BIA that the stop-time rule applies to Santos-

Quiroa.  Accordingly, the petition for review will be denied.

## BACKGROUND

### 1.  The Legal Landscape

We begin with a primer on the principles of immigration

law at play in this case, including a discussion of some important

changes that took effect on April 1, 1997.

Before April 1, 1997, a noncitizen could be placed into

"deportation" proceedings; under current law, they're called

"removal" proceedings.  Compare 8 U.S.C. § 1251(a)(1)(B) (1994)

(describing various classes of "deportable aliens"), with 8 U.S.C.

§ 1229a (describing "removal proceedings").  Per the pre-April 1,

1997 law, a noncitizen "who entered the United States without

inspection or at any time or place other than as designated by the

Attorney General or is in the United States in violation of this

chapter or any other law of the United States is deportable."

8 U.S.C. § 1251(a)(1)(B) (1994).[1]  Deportation proceedings were

_____

[1]  Today's recodified version of this statute, effective
December 23, 2008, provides that a noncitizen who is present in

- 2 -

initiated by serving the noncitizen with a document known as an Order to Show Cause ("OSC"). An OSC put the noncitizen on notice of the allegations of deportability the government was making against him, and it directed him to appear at a hearing on those charges.[2] If a noncitizen failed to appear at his deportation hearing after having received notice of it, he could be ordered deported in absentia. See 8 U.S.C. § 1229a(b)(5)(A).[3]

A noncitizen found to be deportable could apply for various forms of relief, including what was once called suspension of deportation. See 8 U.S.C. § 1254(a) (1994). To qualify, a noncitizen needed to show that he

> has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of such application, and prove[] that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence . . . .

---

the country in violation of any law is deportable. See 8 U.S.C. § 1227(a)(1)(B).

[2] Although it could do so, an OSC did not have to set forth the hearing date, notice of which could be sent separately.

[3] Section 1229a generally provides the rules applying to "proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1).

- 3 -

Id. § 1254(a)(1) (1994).  The requirement of most import to this case is the first one:  that the noncitizen have been physically present in the country for at least seven years prior to applying for suspension of deportation.

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C., 110 Stat. 3009, 3546-724 (1997) (Sep. 30, 1996), which took effect on April 1, 1997.  Concerned that "aliens would often delay their deportation proceedings until they accrued sufficient continuous presence in the United States to qualify for relief" from deportation, Afful v. Ashcroft, 380 F.3d 1, 6 (1st Cir. 2004) (quoting Suassuna v. I.N.S., 342 F.3d 578, 581 (6th Cir. 2003)), as part of the IIRIRA Congress altered the suspension of deportation procedure by enacting what has become known as the stop-time rule.  The stop-time rule provides, in pertinent part, that "any period of continuous residence or continuous physical presence in the United States shall be deemed to end . . . when the alien is served a notice to appear . . . ."  8 U.S.C. § 1229(b)(d)(1).[4]

That IIRIRA referred to NTAs but not OSCs raised a question as to whether the stop-time rule applied to OSCs at all.

---

[4] A "notice to appear" ("NTA") is a charging document introduced by the IIRIRA that initiates "removal proceedings" and takes the place of the pre-IIRIRA OSCs and deportation proceedings. See Peralta v. Gonzales, 441 F.3d 23, 26, 26 n.4 (1st Cir. 2006).

- 4 -

See Afful, 380 F.3d at 7. Congress answered that question in the affirmative when it passed the Nicaraguan Adjustment and Central American Relief Act ("NACARA"), Pub. L. No. 105-100, Tit. II, § 203(a)(1), 111 Stat. 2160, 2196 (Nov. 19, 1997). See Afful, 380 F.3d at 7. NACARA's Section 203 set forth so-called transitional rules regarding applications for suspension of deportation. One of these rules provided that the stop-time rule "shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act." NACARA § 203(1)(5)(A); see also Afful, 380 F.3d at 7.

Thus, following passage of NACARA, the stop-time rule was explicitly applied to OSCs. The effect of the rule is that a noncitizen ceases accruing time in the United States towards qualifying for eligibility for suspension of deportation upon the receipt of the OSC charging him with being deportable. This represents a sharp break with the previous regime, under which a noncitizen continued to accrue time towards the seven-year continuous presence requirement even after having been placed into deportation proceedings.

Whether and how the stop-time rule applies to Santos-Quiroa takes center stage in this appeal.

**2. Santos-Quiroa's Deportation Proceedings**

The facts of this case are generally uncontested. On July 9, 1994, Gilberto Santos-Quiroa, a native and citizen of

Guatemala, crossed the U.S.-Mexican border into Arizona. He did so without having been inspected by an immigration officer, making his entry in violation of United States law and rendering him deportable. Santos-Quiroa was apprehended almost immediately, and deportation proceedings began the following day -- July 10 -- with in-hand service upon him of an OSC. The OSC charged Santos-Quiroa as being deportable for having entered the United States without inspection, and it indicated that a hearing would be scheduled and notice thereof mailed to an address Santos-Quiroa had provided.

Santos-Quiroa was released on bond a little over a week later, having told immigration authorities he would be living at an address (his brother's) in Providence, Rhode Island. Notice of the deportation hearing was mailed to that Providence address on August 4 and instructed Santos-Quiroa to appear before an immigration judge ("IJ") in Phoenix, Arizona, on December 1, 1994. Although the notice had been sent by certified mail and the signed receipt was returned to the immigration court, Santos-Quiroa was a no-show on December 1. Accordingly, the hearing proceeded without him. The IJ found Santos-Quiroa deportable as alleged in the OSC and ordered him deported in absentia. A copy of the IJ's decision was mailed to Santos-Quiroa at the Providence address. This notice advised Santos-Quiroa that the deportation order was "final" unless he filed a motion to reopen in accordance with the then-applicable law.

Santos-Quiroa's case lay fallow for several years. In November 1998 -- at least according to Santos-Quiroa's appellate brief, which does not cite to the administrative record in support of this fact -- he was detained by Immigration and Customs Enforcement ("ICE"), notified of the deportation order against him, and released with an Order of Supervision for the Boston District. Because the government does not contest this factual assertion, and it does not affect our analysis, we take Santos-Quiroa at his word.

Despite the Order of Supervision, Santos-Quiroa's case went dormant again, this time for more than a decade. Over the next ten years Santos-Quiroa got married and fathered two American-citizen children. His immigration proceedings heated up again on September 23, 2009 when, represented by counsel, Santos-Quiroa filed a Motion to Reopen his deportation proceedings with the immigration court in Phoenix. In his motion, Santos-Quiroa asserted that neither he nor his brother received the written notice of the December 1, 1994 deportation hearing. Based on the alleged lack of notice, Santos-Quiroa argued that "his case should be reopened and a new hearing scheduled . . . ." The Department of Homeland Security ("DHS") opposed Santos-Quiroa's request.

The IJ denied the motion, finding that the written notice of the 1994 deportation hearing sent by certified mail to the address Santos-Quiroa had provided constituted sufficient notice

under the Immigration and Nationality Act ("INA"). Santos-Quiroa appealed to the BIA, which agreed with the IJ's take and dismissed his appeal on August 31, 2010.

Nothing else happened on the case until ICE detained Santos-Quiroa on June 18, 2014. Represented by new counsel, Santos-Quiroa filed another motion to reopen. In this motion (which we will call his "Second Motion to Reopen" even though it did not mention the earlier motion), Santos-Quiroa again said that his case should be reopened because he never received notice of the December 1, 1994 deportation hearing.[5] See 8 U.S.C. § 1229a(b)(5)(C)(ii) (providing that an in absentia order of deportation may be rescinded if, "upon a motion to reopen filed at any time . . . the alien demonstrates that the alien did not receive notice in accordance with . . . this title"). Alternatively, Santos-Quiroa asked the IJ to reopen his deportation proceedings sua sponte on the grounds that he is eligible for discretionary relief from deportation, such as withholding of removal and voluntary departure. DHS again opposed, arguing the Second Motion to Reopen is number-barred[6] and without merit anyway.

---

[5] He also argued that the OSC itself -- which had been personally served upon him -- should also have been mailed to him, return receipt requested.

[6] A noncitizen may generally only file a single motion to reopen. See 8 U.S.C. § 1229a(c)(7)(A).

Although Santos-Quiroa filed his Second Motion to Reopen with the immigration court in Phoenix, it was granted by an IJ in Puerto Rico. That IJ's written order allowing the motion set forth a handwritten list of reasons that referenced various immigration forms, statutes, regulations, and BIA decisions. The IJ did not explain why any of these things led her to grant Santos-Quiroa's Second Motion to Reopen. Instead, the order simply states that he was "eligible" for certain types of relief from deportation.

DHS did not appeal the grant of Santos-Quiroa's Second Motion to Reopen. On July 22, 2014, a different IJ (in Arizona this time) granted a motion to change venue to Boston.

Santos-Quiroa filed written pleadings with the immigration court on September 10, 2014 in which he conceded the factual allegations against him in the 1994 OSC and admitted that he is removable. The pleadings indicated that he would be applying for asylum, withholding of removal, protection under the Convention Against Torture ("CAT") and voluntary departure. Santos-Quiroa also applied for suspension of deportation. This particular form of relief remained available to him despite its having been superseded by the newer withholding of removal procedure because it was on the books when deportation proceedings commenced against him in 1994.

At a December 4, 2014 merits hearing before an IJ in Boston, Santos-Quiroa withdrew his requests for asylum,

withholding of removal, and protection under the CAT.  This left for adjudication only his applications for suspension of deportation and voluntary departure.

In his pre-hearing memorandum, Santos-Quiroa had argued that he was eligible for suspension of deportation because the law in effect in 1994 required a noncitizen to be continuously physically present in the United States for seven years before applying for suspension of deportation.  Santos-Quiroa said that he easily met this requirement because he entered the United States on July 9, 1994, and has not left since.  DHS argued that the stop-time rule applies so that Santos-Quiroa's time in the United States is deemed to have ceased accruing on the day he was served the OSC.  Since the OSC was served on the day after he entered the country, DHS argues that for the purposes of suspension of deportation Santos-Quiroa has accrued only one day of physical presence.[7]

The IJ agreed with DHS.  First, he found that Santos-Quiroa's successful Second Motion to Reopen prevented the 1994 <u>in absentia</u> deportation order from becoming a final order of deportation.  Then, citing <u>Aguirre</u> v. <u>Holder</u>, 728 F.3d 48, 51-52, 54 (1st Cir. 2013), the IJ concluded that the stop-time rule

---

[7] The parties also made arguments about Santos-Quiroa's request for voluntary departure.  Since he does not appeal the IJ's denial of that request, we need not get into those arguments here.

applied retroactively to Santos-Quiroa because his deportation proceedings remained pending on the date the stop-time rule went into effect. Thus, he found the stop-time rule cut off Santos-Quiroa's physical presence after one day, rendering him ineligible for suspension of deportation and resulting in his application being pretermitted.[8] The IJ also went on to deny Santos-Quiroa's request for voluntary departure as a matter of discretion, and ordered him removed to Guatemala.

Santos-Quiroa appealed the pretermission of his application for suspension of deportation to the BIA.[9] He argued that the stop-time rule does not apply retroactively to him because, in his view, he had already been subject to a final order of deportation when the stop-time rule first came into effect. Citing Aguirre, 728 F.3d at 53, Santos-Quiroa argued that a pending case is one that is either active or temporarily inactive. Then, relying on the Ninth Circuit's Otarola v. I.N.S. Board of Immigration Appeals, 270 F.3d 1272 (9th Cir. 2001), he concluded that his application for suspension of deportation must be governed by the law in effect prior to the advent of the stop-time rule,

---

[8] "An application is pretermitted when disqualified for failure to meet the threshold eligibility requirement that an alien have resided in the United States for a sufficient period of time to obtain the discretionary relief of suspension of deportation." Afful, 380 F.3d at 6.

[9] He did not challenge the finding of deportability.

- 11 -

under which he had accrued well in excess of the seven years of physical presence required for him to be eligible for suspension of deportation.  DHS stuck to its guns and maintained that the stop-time rule cut off his accrual of time towards eligibility for suspension of deportation at just one day.

The BIA issued a written opinion dismissing Santos-Quiroa's appeal.  Although neither party had raised any issue with the IJ's allowance of the Second Motion to Reopen, a footnote in the BIA's decision appears to call that decision into question.  Nevertheless, the BIA indicated that it did not have jurisdiction to review it because DHS chose not to appeal the reopening of the proceedings.  In any event, the BIA stated that it would "not presume" that the IJ "granted the motion on legally defective grounds."  It also went on to note that new pleadings were taken after the Second Motion to Reopen had been granted, and that it would, therefore, treat the IJ as having rescinded the December 1, 1994 in absentia deportation order.

Despite all that, the BIA proceeded to find that whether Santos-Quiroa's deportation proceedings were "pending" or "final" on April 1, 1997 was irrelevant to his eligibility for suspension of deportation.  It began by citing In re Nolasco-Tofino, 22 I. & N. Dec. 632 (B.I.A. 1999), for the proposition that the stop-time rule applies to each and every OSC regardless of the date of service upon the noncitizen.  The BIA went on to note that while

the Ninth Circuit has held that pre-stop-time rule law applies to noncitizens whose orders of deportation became final before April 1, 1997, the First Circuit had not yet decided the question. The BIA, disagreeing with the Ninth Circuit, held that whether a noncitizen's deportation proceedings were final or pending on April 1, 1997 has no effect on the stop-time rule. In its view, the plain language of the IIRIRA mandates the rule's application to all OSCs, regardless of the date of issue and irrespective of whether deportation proceedings were pending or final on April 1, 1997.

Turning its focus to Santos-Quiroa, the BIA concluded that "[n]either the entry of the December 1, 1994, final order of deportation order [sic], nor the July 3, 2014, order reopening the proceedings and rescinding the 1994 deportation order, has changed or negated the effect of the Order to Show Cause on [Santos-Quiroa's] eligibility for suspension of deportation." Because Santos-Quiroa was served with an OSC on the day after he entered the United States, the BIA concluded that the stop-time rule made it so that he accrued only one day of the seven years of physical presence necessary to become eligible to apply for suspension of deportation. Accordingly, it dismissed Santos-Quiroa's appeal.

Santos-Quiroa then filed his petition for review with this Court.

## STANDARD OF REVIEW

The BIA's written decision set forth its own analysis of the stop-time rule and discussed how it applies to Santos-Quiroa's case.  While it did mention the IJ's findings at the outset, the BIA conducted its own legal analysis and reached its own conclusion.  Accordingly, we review the BIA's decision, not the IJ's.  See Romilus v. Ashcroft, 385 F.3d 1, 5 (1st Cir. 2004) ("Ordinarily, this court reviews the decision of the BIA.").

Santos-Quiroa's petition for review focuses on the applicability and application of the stop-time rule to the uncontested facts of his case.  His petition presents us with "pure questions of law, triggering de novo review."  Aguirre, 728 F.3d at 52.  Even under the de novo standard, however, we have recognized that because "immigration law frequently implicates some expertise in matters of foreign policy, BIA interpretations of the statutes and regulations it administers are accorded substantial deference."  Elien v. Ashcroft, 364 F.3d 392, 396 (1st Cir. 2004) (citing I.N.S. v. Aguirre-Aguirre, 526 U.S. 415, 425 (1999)).  As such, "[w]hen a statute is silent or ambiguous . . . we uphold the implementing agency's statutory interpretation, provided it is reasonable and consistent with the statute."  Id. at 397 (internal quotation marks omitted).

**DISCUSSION**

## 1. The Parties' Positions

Santos-Quiroa presents us with a two-part argument as to why the BIA erred in finding him ineligible for suspension of deportation. He begins with the premise that the stop-time rule applies only to deportation proceedings pending on or brought after April 1, 1997. He gets this idea from "transitional rules" implemented as part of the IIRIRA that specify instances in which certain noncitizens remain subject to pre-IIRIRA, pre-stop-time rule, law. In Santos-Quiroa's view, noncitizens who were subject to a final order of deportation on April 1, 1997 are unaffected by the stop-time rule.

From there, Santos-Quiroa moves on to the second part of his argument and says that his 1994 in absentia order was a final order of deportation. He says the BIA erred when it found (in that footnote mentioned above) that his Second Motion to Reopen resulted in the deportation order's rescission. This misstep, Santos-Quiroa urges, caused the BIA to view the deportation proceedings against him as "pending" on April 1, 1997, and incorrectly apply the stop-time rule to his request for suspension of deportation. Instead, Santos-Quiroa says, the BIA should have found that his Second Motion to Reopen did not rescind the 1994 order, but left it intact as a final order. Had the BIA gotten this right, it would then have simply allowed him to apply for

- 15 -

discretionary forms of relief under pre-IIRIRA, pre-stop-time rule law. Without the stop-time rule cutting off his accrual of physical presence in the United States after one day, Santos-Quiroa argues that he accrued more than twenty years of such presence before he applied for suspension of deportation in 2014. Accordingly, he asks us to find that he is eligible for suspension of deportation and remand to the BIA for further proceedings on his application.

The government, echoing Nolasco-Tofino and the BIA's reasoning in its dismissal of Santos-Quiroa's appeal, argues that the stop-time rule applies to all OSCs, regardless of the date of issue. As the government sees it, the plain language in the IIRIRA, including its "transitional rules," and the amendments wrought by NACARA provide no basis to differentiate between deportation proceedings that were pending and those that had become final as of April 1, 1997 for purposes of the stop-time rule. Furthermore, it says that accepting Santos-Quiroa's argument would violate Congress's intent in enacting the stop-time rule by rewarding him (and others who have acted similarly) for absconding from immigration authorities instead of reporting for deportation as ordered. Thus, DHS's position is that the stop-time rule applies not only to deportation proceedings that remained pending

on April 1, 1997, but also to those that had already terminated in a final order.[10]

### 2. IIRIRA's Transitional Rules

As we mentioned earlier, the IIRIRA worked several important changes to the immigration law of the United States. Accordingly, Congress enacted special transitional rules governing how the law would be applied to noncitizens who were already involved in deportation proceedings as of the date the IIRIRA became effective. See IIRIRA § 309. "Since proceedings against [Santos-Quiroa] commenced prior to April 1, 1997, the transitional rules of IIRIRA apply to his case." Peralta v. Gonzales, 441 F.3d 23, 26 (1st Cir. 2006). Of significance here, the IIRIRA set forth the following provisions:

> (c) TRANSITION FOR ALIENS IN PROCEEDINGS.--
>
> (1) GENERAL RULE THAT NEW RULES DO NOT APPLY.--Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III-A effective date [i.e., April 1, 1997]--
>
>> (A) the amendments made by this subtitle shall not apply, and
>>
>> (B) the proceedings (including judicial review thereof) shall continue to be

---

[10] Although the government contends in a footnote to its brief that the BIA did not err in treating the 1994 deportation order as having been rescinded, it does not argue that this means the case was "pending" on April 1, 1997. Instead, it maintains that whether the 1994 deportation order was pending or final on that date is completely irrelevant.

- 17 -

conducted without regard to such amendments.

IIRIRA § 309(c)(1).

The statute goes on to provide a rule specific to deportation proceedings:

> (5) TRANSITIONAL RULE WITH REGARD TO SUSPENSION OF DEPORTATION.--Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of the enactment of this Act.

IIRIRA § 309(c)(5).[11] This is the language that NACARA amended to refer to OSCs like the one Santos-Quiroa received. See Afful, 380 F.3d at 7 (quoting NACARA § 203(a)(1)).[12] Thus, Section 309(c)(5) is an exception to the general non-retroactivity transitional rule and makes it so that "even if an alien had been served with a[n] [OSC] prior to April 1, 1997, the new stop-time rule would apply." Id.

---

[11] We have described this language as creating an exception to IIRIRA § 309(c)(1)'s "general rule" that its amendments do not apply to noncitizens already in exclusion or deportation proceedings as of April 1, 1997. Afful, 380 F.3d at 7.

[12] Though NACARA substituted the phrase "orders to show cause" for "notices to appear" in the IIRIRA's statutory language, see NACARA §§ 203(a)(1), (a)(5)(A), this case does not require us to consider whether IIRIRA § 309(c)(5)'s transitional rule continues to apply to NTAs as well. So we express no opinion on this subject.

- 18 -

What we must figure out is whether the BIA erred in its interpretation and application of the transitional rules to Santos-Quiroa.

### 3. Analysis

Today is not the first time we or the BIA have been called upon to explain the transitional rules' effects on the stop-time rule. Indeed, following NACARA's enactment, the BIA clarified that the stop-time rule applies to "all applications for . . . suspension of deportation." Afful, 380 F.3d at 7 (quoting Nolasco-Tofino, 22 I. & N. Dec. at 637). In Afful, we recognized that "every circuit to have addressed the question has found that the stop-time rule applies retroactively to orders to show cause [i.e., OSCs] issued prior to the enactment of the IIRIRA." Id. (collecting cases).[13]  Aligning ourselves with the other federal courts, we concluded that a noncitizen who entered the United States in October 1989 and was served with an OSC five-and-a-half-years later was ineligible for suspension of deportation because his continuous presence was deemed to have come to an end upon service of the OSC. See id. at 6-8.

We addressed the stop-time rule again in Aguirre v. Holder, 728 F.3d 48 (1st Cir. 2013). Aguirre involved a Colombian national who came into the United States in August 1986 and was

---

[13] We cited cases from the Third, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits.

- 19 -

served with an OSC in January 1987. 728 F.3d at 50. We once again stated that the IIRIRA's transitional rules dictate that the stop-time rule is to be "applied . . . retroactively to OSCs issued before IIRIRA's enactment." Id. at 51. "Consequently, noncitizens who were already in proceedings as of IIRIRA's effective date are unable to demonstrate the requisite years of continuous physical presence if they were issued OSCs before meeting the duration requirement." Id.

We concluded in Aguirre that the stop-time rule applied retroactively in that case because deportation proceedings against the noncitizen had been pending when the IIRIRA went into effect on April 1, 1997. See id. at 53. Specifically, deportation proceedings were initiated with the service of an OSC on January 9, 1987, id. at 50-51, but when Aguirre did not show up at the deportation hearing, an "IJ ordered the case administratively closed until he could be located," id. at 51. A new case was opened in 2005 when Aguirre was issued an NTA, but "[a]t some point, it was discovered that Aguirre already had an open immigration case based on his 1987 OSC, and the proceedings based on his 2005 NTA were terminated." Id. at 51-52. Aguirre sought to reopen the 1987 proceedings and applied for suspension of deportation. Id. at 52.

On appeal to this court after his request for suspension of deportation had been denied, Aguirre argued that the 1987

proceedings, having been administratively closed, were not "pending" at the time the stop-time rule came into effect and, therefore, the rule cannot be applied to him retroactively. Id. at 53. We, however, stated that "administrative closure 'is a procedural convenience . . . , but it does not constitute a final order.'" Id. (alteration in original) (quoting Lopez-Reyes v. Gonzales, 496 F.3d 20, 21 (1st Cir. 2007)). Thus, the administrative closure of his case in 1987 after he failed to appear for the deportation hearing did "not terminate the proceedings or result in a final order of removal." Id. To the contrary, his case "remained on the IJ's docket and his proceedings reached no definitive end." Id. It followed, we said, that Aguirre's deportation proceedings remained "pending" when the stop-time rule came into effect on April 1, 1997 and we therefore held that the stop-time rule applied to Aguirre, rendering him ineligible for suspension of deportation given that he stopped accruing time towards the seven-year threshold when he was served with an OSC within months of his entry into the United States. Id.

Santos-Quiroa tries to get some mileage out of Aguirre by telling us the case stands for the proposition that the stop-time rule does not apply to deportation orders that had become final prior to April 1, 1997. To support this reading he twice quotes the Aguirre panel as having written that, "unless there has

- 21 -

been a final order of removal issued in a case prior to IIRIRA's effective date of April 1, 1997, IIRIRA's stop-time rules apply, even retroactively."  Petitioner's Br. at 12, 24 (emphasis added). Based on this language, Santos-Quiroa reasons that because his in absentia deportation order was "final" in 1994, the stop-time rule does not apply to his 2014 application for suspension of deportation.

The problem with Santos-Quiroa's argument, however, is that we simply never said in Aguirre what he says we did.  The language he misattributes to us is actually found in the IJ's December 4, 2014 decision and encapsulates the IJ's view of Aguirre's import.  Needless to say, the IJ's statement cannot alter or change the holding of this court.  And the IJ, we think, overstated Aguirre's breadth.

It is true that in Aguirre we concluded that the stop-time rule applied to the noncitizen because his deportation proceedings were still pending as of April 1, 1997.  But we simply did not address or purport to address what the result would have been had the deportation proceedings reached their final stage. So, while Aguirre stands for the proposition that the stop-time rule applies to noncitizens whose deportation proceedings were pending as of April 1, 1997, it had nothing to say about the stop-time rule's application to final orders of deportation.  Thus, any

intimation that Aguirre, by itself, precludes the stop-time rule from applying to a final deportation order is without merit.

Moreover, we agree with the BIA that, according to the stop-time rule's plain language, whether or not a noncitizen's deportation proceedings were pending or final on April 1, 1997 is irrelevant. The applicable transitional rule could hardly be more clear, stating that the stop-time rule "shall apply to orders to show cause . . . issued before, on, or after the date of the enactment of this Act." IIRIRA § 309(c)(5)(A). Nothing in the text provides any basis to think that whether a noncitizen's deportation order was final as of April 1, 1997 has any effect on the stop-time rule. We conclude that the plain statutory language, as amended by NACARA, demonstrates that Congress intended the stop-time rule to apply to all OSCs, regardless of whether they were issued on, before, or after April 1, 1997.

Indeed, we have already explicitly recognized that the stop-time rule applies retroactively. Afful, 380 F.3d at 7 (agreeing with the BIA and "every circuit to have addressed the question . . . that the stop-time rule applies retroactively"); Peralta, 441 F.3d at 27 (same); see also Nolasco-Tofino, 22 I. & N. Dec. at 637 (concluding that the stop-time rule was intended "to apply broadly and immediately" to OSCs "'issued before, on, or after' the IIRIRA's effective date" (quoting IIRIRA § 309(c)(5)(A)). So even though deportation proceedings in both

Aguirre and Afful happened to have been pending on that April 1 date, we find nothing in those opinions to indicate the outcome should vary based on the status of a noncitizen's deportation proceedings on April 1, 1997. Moreover, such an outcome would require us to depart from the plain text of the stop-time rule. Therefore, we conclude that the BIA's interpretation of the stop-time rule was reasonable and consistent with the statutory language.

Nevertheless, Santos-Quiroa seizes upon the Ninth Circuit's opinion in Arrozal v. I.N.S., 159 F.3d 429 (9th Cir. 1998), to argue that we should distinguish between deportation proceedings that were pending and those that were final as of April 1, 1997. In Arrozal, the Ninth Circuit concluded that the stop-time rule did not apply there because a "final administrative decision" had been rendered prior to April 1, 1997. 159 F.3d at 434. Importantly, however, the court clarified that the order of deportation became final upon the BIA's denial of the noncitizen's motion to reopen the deportation proceedings. Id. at 434 n.3. And that "final administrative decision[]" was rendered on December 30, 1996. Id. Thus, the Ninth Circuit's reasoning was rooted in its conclusion that the deportation order had become final before the stop-time rule went into effect.

- 24 -

Even if we assume Arrozal was correctly decided (a question on which we need not opine)[14] and apply its reasoning here, this would do Santos-Quiroa no good. This is because the BIA denied Santos-Quiroa's First Motion to Reopen in 2010. Under Arrozal's reasoning, Santos-Quiroa's 1994 in absentia deportation order would not be considered final until the denial of his First Motion to Reopen more than 15 years after the stop-time rule went into effect. See also Kay v. Ashcroft, 387 F.3d 664, 672 (7th Cir 2004) (discussing that since the only way to "appeal" an in absentia order of removal is by way of a motion to reopen, an in absentia deportation order does not become final until the BIA denies a motion to reopen); In re L-V-K, 22 I. & N. Dec. 976, 978 (B.I.A. 1999) ("[A]n administrative order is final when the Board renders its decision in a case on appeal or certification or, where no appeal is taken, when the time allotted for appeal has expired or the right to appeal is waived." (citing Matter of Lok, 18 I. & N. Dec. 101, 105 (B.I.A. 1981), aff'd, 681 F.2d 107 (2d Cir. 1982)));

---

[14] In its written decision, the BIA indicated that it "disagree[d]" with the Ninth Circuit's analysis. We also note that in the post-Arrozal case of Ram v. I.N.S., 243 F.3d 510 (9th Cir. 2001), the Ninth Circuit expressed approval of the BIA's Nolasco-Tofino decision and held "that IIRIRA section 309(c)(5)(A) generally applies the stop-time rule to transitional rule aliens whose deportations were initiated with the service of an OSC and who seek suspension of deportation." Ram, 243 F.3d at 516. Ram does not cite Arrozal and its reasoning appears to diverge markedly from Arrozal's, a development that casts doubt on Arrozal's continued efficacy as persuasive analysis.

8 C.F.R. § 1003.23(b)(4)(iii)(A)(2) (allowing an alien to file a motion to reopen an in absentia order of removal at "any time" provided the alien "demonstrates that he or she did not receive notice" of the hearing in accordance with the statute). Accordingly, Arrozal is inapposite to Santos-Quiroa's factual situation, and we decline to apply its reasoning here to reach a result that would be contrary to the plain language of the statute.

As mentioned at the outset, the first part of Santos-Quiroa's two-pronged argument is that the stop-time rule does not apply to orders of deportation that became final before April 1, 1997. He has not presented any argument (whether rooted in due process or any other theory) that the stop-time rule cannot or should not apply to him in particular even if we conclude that it generally applies retroactively. Accordingly, any such argument has been waived. Because we conclude the stop-time rule applies regardless of the date on which a deportation order became final, we have no need to determine whether the order against Santos-Quiroa was pending or final on April 1, 1997. And we do not reach Santos-Quiroa's remaining arguments, all of which are grounded in the distinction we have just rejected between final and pending deportation proceedings.

## CONCLUSION

As we are unable to say that the BIA's interpretation of the stop-time rule was anything other than reasonable, Santos-Quiroa's petition for review is **denied.**